Filed 2/20/14  In re L.B. CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re L.B., et al., Persons Coming Under the Juvenile Court Law. | B251275<br><br>(Los Angeles County<br>Super. Ct. No. CK99130) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>   v.<br><br>C.B.,<br><br>        Defendant and Appellant. | |

Appeal from orders of the Superior Court of Los Angeles County.  Stephen Marpet, Juvenile Court Referee.  Affirmed.

Maureen L. Keaney, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and Terry T. Truong, Deputy County Counsel, for Plaintiff and Respondent.

\* \* \* \* \* \*

This is an appeal by C.B. (father) from the juvenile court's jurisdiction and disposition orders. Father and B.D. (mother) have three minor children together. Following an incident in which father was arrested for domestic battery against mother, the children were detained by the Department of Children and Family Services. The children were subsequently released to mother, but removed from father's custody. Family maintenance services were ordered for mother. Father was ordered to not live in the family home, was granted monitored visitation and was ordered to participate in counseling and various classes. Father contends the court's orders are not supported by substantial evidence. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

On January 26, 2013, Deputy Parra of the Los Angeles County Sheriff's Department responded to a domestic violence call at mother and father's home. Upon arrival, Deputy Parra interviewed mother. Mother reported father had told her to bring him an extension cord and then became upset with her for not retrieving it quickly enough. He "lunged toward her and grabbed her hair, forcefully." Father then threw her onto the bed and pushed her head into the mattress hard, five or six times, yelling at her the whole time. Mother said her head hurt from her hair being pulled so hard, but denied needing any medical attention. Deputy Parra did not see any visible injuries on mother.

Deputy Parra then interviewed father. Before questioning him about the incident, she read him his *Miranda*[1] rights and told him she was going to record his interview on audiotape. Father agreed to speak with Deputy Parra. Father reported he had asked mother to get him an extension cord and she told him to wait. After waiting several minutes, he got angry, walked over to mother and grabbed her hair. In response, mother turned toward him and slapped him four or five times in the face. Deputy Parra noticed father had a slightly red and swollen lip. He denied needing medical attention.

---

[1] *Miranda v. Arizona* (1966) 384 U.S. 436.

Based on the interviews and her experience, Deputy Parra believed father had attacked mother and mother had acted in self-defense. Deputy Parra placed father under arrest for spousal battery (Pen. Code, § 243, subd. (e)(1)). Before leaving, Deputy Parra offered mother an emergency protective order. Mother declined, claiming she would obtain one on her own. Mother then told Deputy Parra that father had hit her on at least nine other occasions. She had called the police once before, but no report had been made. Mother told Deputy Parra she found a handgun in the home and had hidden it, but was afraid father would use "it against her." Mother asked Deputy Parra to take it "for safekeeping." Deputy Parra took the handgun and booked it into evidence along with the audiotape of father's statement.

A referral was made to the Department regarding the incident, including that the assault by father on mother had occurred in their bedroom where the youngest child was asleep at the time, that mother had banged on the wall, yelling for help and for someone to call the police, and that father had ultimately been arrested.

On January 31, 2013, a Department social worker went, unannounced, to mother and father's home to investigate. The family was not home. While there, the social worker spoke to the maternal relatives who had called law enforcement about the incident. The maternal relatives lived on the same property but in a different unit. They told the social worker they heard an argument and then heard loud banging on the wall. One of them ran over to find out what was wrong. He found mother and father together in the bedroom, mother appeared to be upset and father was "verbally abusing" her. He said the three children appeared to be afraid and looked " 'like animals huddling on the floor.' " The relatives reported they heard arguments all the time but had not actually observed father hitting mother. They said mother told them she and father had "problems" and that father hits her. They reported the children have said, more than once, that " '*mi papi golpea a mi mami*' " ("my dad hits my mom"), and Ca.B. specifically pointed at father one time and said " '*tu le pegaste a mi mami*' " ("you hit my mom").

3

The social worker returned on February 1, 2013, and interviewed the family, individually and in private. Mother denied any domestic violence. Mother said she and father did have an argument a few days earlier about her not bringing father a cord quickly enough, that father did get upset, but he only pulled her hair " 'softly.' " Mother denied she banged on the wall or acted threatened or in a panic and claimed her family members were making false allegations against father. Mother said father may have " 'shrugged her with his shoulder' " on previous occasions, but not violently and he did not hit her. Mother said she allowed father to come home the next day after being released from jail because he apologized. Mother said father does get upset for " 'small reasons' " and agreed he would benefit from an anger management class.

Father also denied any domestic violence. Father admitted he got upset when mother did not bring him the extension cord he had asked for, but said he pulled her hair without using any force. Father denied ever hitting mother, claiming they "play fight" and he pushes mother but only in a "playful manner." Father said he was only arrested because mother told the police he had pulled her hair. He claimed mother's family members are jealous of their relationship, are trying to "destroy" them and are therefore making false allegations against him.

At the time of the incident, the children, L.B., Ca.B., and K.B., were 9, 7, and 3 years old, respectively. The two older children have both been diagnosed with autism and are receiving therapy. Ca.B. also has a speech impediment. The eldest boy, L.B., was resistant to speaking with the social worker, answering " 'I don't know' " to almost every question. Ca.B. was talkative but difficult to understand. He responded yes when asked if he had ever seen father hit mother, but the social worker felt the overall answer was difficult to understand. When asked if father ever hit him, Ca.B. said " 'no, only to mommy.' " K.B. kept her eyes closed. Mother said K.B. was pretending to be asleep. K.B. did not respond to the social worker's questions. To the extent responses were obtained, none of the children expressed fear of father, and none had any visible injuries.

4

The social worker also spoke with Rosario de la Cerda, Ca.B.'s therapist, and she denied ever witnessing any domestic violence when she visited the home to work with Ca.B.

Mother and father agreed to voluntarily participate in an "upfront assessment" for domestic violence. After the assessment, it was recommended that father complete domestic violence and parenting classes, and that mother take a parenting class.

On February 21, 2013, the criminal court handling father's battery charge issued a protective order in mother's favor and ordered father not to live in the family home for one month. Father apparently complied and went to live with a paternal relative. Shortly thereafter, mother sought a modification of the protective order to allow "peaceful contact."

In late March 2013, the Department obtained a copy of Deputy Parra's incident report summarizing her investigation and her interviews of mother and father on January 26, 2013. The social worker returned to mother and father's home to speak with mother regarding the significantly different description of the incident she gave to Deputy Parra.

Mother told the social worker she had the criminal protective order lifted and father had been "in the home" but no new incidents had occurred. Mother continued to deny any domestic violence and claimed the statements contained in Deputy Parra's report were false. Mother said father pushes her, and that she and father " 'play around' " at hitting each other, but always laugh and there is no violence or aggression. Mother reiterated she had allowed father to come home after being released from jail because he had apologized, had " 'learned his lesson' " and she needed help taking care of the children. Mother and father both agreed that father would leave the family home again if that is what the Department wanted and if it would allow the process to be finished as soon as possible.

5

On April 24, 2013, the Department filed a petition pursuant to Welfare and Institutions Code section 300, subdivisions (a) and (b).[2]  The allegation in count a-1 reads, in material part, as follows:  "[Mother and father] have a history of engaging in violent altercations in the presence of the children.  On 01/26/2013, the father pulled the mother's hair and threw the mother onto a bed and repeatedly pushed the mother's head into a mattress in the presence of the children.  On prior occasions, the father struck the mother in the children's presence.  On 01/26/2013, the mother repeatedly slapped the father's face, in the presence of the children, inflicting swelling and redness to the father's lip.  On 01/26/2013, the father was arrested for Domestic Battery.  The mother failed to protect the children.  The mother allowed the father to reside in the children's home. . . .  Such violent conduct on the part of the father against the mother and the mother's failure to protect the children endangers the children's physical health and safety and places the children at risk of physical harm."  Count b-1, for failure to protect and supervise, is based on substantially the same allegations.

At the detention hearing, the court made detention findings against father, and ordered the children released to mother.  Father presented evidence he was currently enrolled in parenting and domestic violence programs.  The Department was ordered to provide mother with family maintenance services, and father with reunification services and appropriate referrals.  Father was granted monitored visitation.

In June 2013, another Department social worker interviewed the family again. Mother continued to deny any domestic violence occurred in the home.  She said the allegations were "overblown" and that it was typical for father to "playfully grab her by her arms, and gingerly by the hair, and push her towards the couch in a playful manner." She admitted she banged on the wall on the night of the incident but that she just wanted her sister to come over to tell father to stop acting childish because she was not feeling well that day.  Mother said her relatives do not like father and do not understand that he

---

[2]      All further undesignated section references are to the Welfare and Institutions Code.

6

has a "playful" personality. She said the statements in the police report are false and that she turned over the handgun to Deputy Parra for safekeeping and not because she was fearful of father. Mother conceded that all of the children were in the home at the time the January incident took place.

Father also continued to deny he ever hit mother or was ever violent with her. He said he and mother routinely engage in playful behavior, including "grabbing" and "wrestling." He said mother's relatives just misunderstood the situation and "overreacted" by calling the police. Father claimed to not recall telling the police that mother had slapped him in the face several times. Father said he did have a gun but that he always kept it secure and he had never threatened mother with it.

During the June visit, the social worker observed that the children played and interacted with mother without any problems and none of the children displayed any hesitation or apprehension interacting with anyone. All of the children denied ever seeing their parents hit each other.

The jurisdiction and disposition report stated mother's and father's perceptions of their needs are poor, as they continue to minimize the level of domestic violence. "The fact that the parents are completely dismissing the seriousness of domestic violence by downplaying and minimizing, speaks volumes about the parents['] lack of insight into the dynamics of domestic violence, and causes the Department to question the safety of these children long-term, absent comprehensive treatment." The social worker noted that father does provide financially for the family and that both mother and father appear to be receptive to services and cooperative with the Department. The Department recommended that mother be ordered to complete a domestic violence class for victims and a parenting class, and that father be ordered to take a domestic violence class for perpetrators, as well as an anger management class. The Department also recommended counseling for all family members.

At the adjudication hearing, the court sustained the petition as alleged. The court ordered the children removed "from father, placed home of parent mother, as the court finds by clear and convincing evidence, there's a substantial danger to the minors'

7

physical and mental well-being." The court ordered family maintenance services for mother, and ordered her to participate in individual counseling, a parenting class and a domestic violence class for victims. For father, the court ordered him to take a 52-week domestic violence class for perpetrators, a parenting class, and individual counseling to address case issues, including anger management. Father was ordered to have monitored visitation, with the court specifying that mother could not serve as the monitor and the visits were not to take place in the family home. The Department was granted discretion to liberalize the visitation orders.

This appeal followed.

## DISCUSSION

Father contends the jurisdictional and dispositional orders are not supported by substantial evidence, and that the juvenile court further erred in ordering monitored visitation. We are not persuaded.

### 1.    Jurisdiction

The focus of dependency proceedings is on the protection of minor children. (*In re I.A.* (2011) 201 Cal.App.4th 1484, 1491-1492.) To acquire jurisdiction over a child, a juvenile court need only "find that one parent's conduct has created circumstances triggering section 300." (*Id.* at p. 1492.) "[I]t is commonly said that a jurisdictional finding involving one parent is ' "good against both. More accurately, the minor is a dependent if the actions of either parent bring [the minor] within one of the statutory definitions of a dependent." ' [Citation.]" (*Ibid.*) " 'This accords with the purpose of a dependency proceeding, which is to protect the child, rather than prosecute the parent.' [Citation.]" (*In re X.S.* (2010) 190 Cal.App.4th 1154, 1161.) As a result, "an appellate court *may decline to address the evidentiary support for any remaining jurisdictional findings once a single finding has been found to be supported by the evidence*." (*In re I.A.*, *supra*, at p. 1492, italics added.)

Father's attack on the jurisdictional findings does not *expressly* contest the findings as to mother. Even if we considered reversing the jurisdictional findings as to father, the juvenile court would retain jurisdiction over the children based on the

8

sustained, and unchallenged, allegations against mother.  Therefore, father's attack on the jurisdictional findings relative to his conduct alone is nonjusticiable.  (*In re I.A.*, *supra*, 201 Cal.App.4th at pp. 1490-1491 ["An important requirement for justiciability is the availability of 'effective' relief—that is, the prospect of a remedy that can have a practical, tangible impact on the parties' conduct or legal status."].)

Nonetheless, we briefly address father's argument on the merits.  It is appropriate to discuss the merits in light of father's challenge to the disposition orders.  (See *In re Drake M*. (2012) 211 Cal.App.4th 754, 762.)

The children were declared dependents, and jurisdiction over them was sustained, under section 300, subdivision (a) and subdivision (b).  " 'On appeal from an order making jurisdictional findings, we must uphold the court's findings unless, after reviewing the entire record and resolving all conflicts in favor of the respondent and drawing all reasonable inferences in support of the judgment, we determine there is no substantial evidence to support the findings.' [Citation.]" (*In re Christopher C*. (2010) 182 Cal.App.4th 73, 84.)

The record contains solid evidence supporting the court's jurisdictional finding under section 300, subdivision (b).  "Exposure to domestic violence may serve as the basis of a jurisdictional finding under section 300, subdivision (b)." (*In re R.C*. (2012) 210 Cal.App.4th 930, 941; accord, *In re T.V*. (2013) 217 Cal.App.4th 126, 135 [dependency jurisdiction proper because even though child had not yet been physically harmed, "the cycle of violence between the parents constituted a failure to protect her 'from the substantial risk of encountering the violence and suffering serious' " harm.]; *In re Sylvia R*. (1997) 55 Cal.App.4th 559, 562 [" 'Both common sense and expert opinion' . . . 'indicate spousal abuse is detrimental to children.' "]; *In re Heather A*. (1996) 52 Cal.App.4th 183, 194 ["[D]omestic violence in the same household where children are living *is* neglect; it is a failure to protect [the children] from the substantial risk of encountering the violence and suffering serious physical harm or illness from it. Such neglect *causes* the risk."]

The sustained allegations under count b-1 relative to the failure to protect are supported by substantial evidence establishing a pattern of domestic violence between father and mother in the home while the children are present. When asked if father ever hit him, Ca.B told the social worker " 'no, only to mommy.' " Mother's relatives reported to the social worker that the children have said, on several occasions, " '*mi papi golpea a mi mami*' " ("my dad hits my mom"). It was also reported that Ca.B. pointed directly at father and said " '*tu le pegaste a mi mami*' " ("you hit my mom"). The maternal relatives told Deputy Parra that mother said father hit her, that they heard arguments regularly and mother admitted they had "problems." On the night of the incident, the maternal relatives reported the children looked like frightened animals " 'huddling on the floor.' " Mother reported to Deputy Parra that father had hit her at least nine other times, and she spontaneously turned over a handgun to the deputy because she feared father might use it against her. Further, there is ample evidence mother is prone to act in ways that fail to reflect any insight into the need to protect the children from father's behavior, and instead, show a desire to protect father and downplay any wrongdoing on his part.

Such evidence severely undermines father's claim the January 2013 incident was an isolated event, and underscores the clear risk for further incidents reflected in both mother's and father's continued protestations there has never been physical violence between them, and that everyone just misunderstands father's "playful" personality. It also shows the violence occurs, at least at times, in the presence of the children which heightens the risk to them both physically and emotionally. Simply because there is no evidence father has hit the children, and they did not express any fear of him to the social worker, does not mean they are not at substantial risk of injury. (*In re Heather A.*, *supra*, 52 Cal.App.4th at p. 194 ["Obviously the children were put in a position of physical danger from this violence, since, for example, they could wander into the room where it was occurring and be accidentally hit by a thrown object, by a fist, arm, foot or leg."].)

The record supports the court's jurisdictional findings pursuant to section 300, subdivision (b). We need not address the court's findings with respect to the allegations pursuant to section 300, subdivision (a). (*In re I.A.*, *supra*, 201 Cal.App.4th at p. 1492.)

## 2. Disposition and Visitation

The evidence recited above substantially supports the court's order removing the children from father's custody and placing them with mother. (*In re R.V.* (2012) 208 Cal.App.4th 837, 849 ["The jurisdictional findings are prima facie evidence the child cannot safely remain in the home. . . . The parent need not be dangerous and the child need not have been actually harmed before removal is appropriate."].)

As for the scope of the orders, the juvenile "court may order reunification services to facilitate reunification between parent and child. 'The court has broad discretion to determine what would best serve and protect the child's interest and to fashion a dispositional order in accord with this discretion. [Citations.] We cannot reverse the court's determination in this regard absent a clear abuse of discretion. [Citation.]' [Citation.]" (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 454; accord, *In re A.L.* (2010) 188 Cal.App.4th 138, 142-146 [juvenile court has broad discretion to fashion appropriate disposition orders "designed to eliminate those conditions that led to the court's finding that the child" is a dependent child].)

Father was ordered to complete a 52-week domestic violence class, a parenting class and to participate in individual counseling to address case issues, including anger management. Given the evidence in the record, father has failed to establish the court's dispositional order amounted to " 'an arbitrary, capricious, or patently absurd determination.' [Citation.]" (*In re Alexis E.*, *supra*, 171 Cal.App.4th at p. 454.) This is equally true for the court's decision to order monitored visitation over father's objection. "One of the dependency court's responsibilities is to define the rights of the parties to visitation by balancing the rights of the parent with the best interests of the child." (*In re R.R.* (2010) 187 Cal.App.4th 1264, 1284.) The Department was given discretion to liberalize visitation. Father submitted letters reflecting progress in his courses, including a report from his parenting instructor that he was making "excellent" progress. However,

11

as already discussed above, there is ample evidence that both father and mother continue to minimize the seriousness of domestic violence and its impact on their children. Should father continue to take his classes and counseling seriously, the Department will be able to liberalize visitation to so reflect. Father may also, if appropriate, seek a modification of the court's order through the filing of a section 388 petition. To the extent father suggests the two boys may have trouble with monitored visitation and being around strangers in light of their autism, the record does not indicate the juvenile court was ever advised of the issue or requested to address it in fashioning a visitation order. Father has not affirmatively shown any basis for reversing the court's dispositional orders.

## DISPOSITION

The jurisdiction and disposition orders are affirmed.


GRIMES, J.


We concur:


BIGELOW, P. J.


RUBIN, J.