[No. B221851. Second Dist., Div. One. Nov. 17, 2010.]

In re X.S., a Person Coming Under the Juvenile Court Law.
LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY
SERVICES, Plaintiff and Respondent, v.
MATTHEW M., Defendant and Appellant.

### COUNSEL

Nancy Rabin Brucker, under appointment by the Court of Appeal, for Defendant and Appellant.

Andrea Sheridan Ordin, County Counsel, James M. Owens, Assistant County Counsel, and William D. Thetford, Principal Deputy County Counsel, for Plaintiff and Respondent.

### OPINION

**ROTHSCHILD, Acting P. J.**—Matthew M. (father), the biological father of X.S., appeals from the judgment entered after the juvenile court declared his son a dependent child of the court based in part on a finding against father under Welfare and Institutions Code section 300, subdivision (b),[1] and ordered the child placed with his maternal grandmother. Because no substantial evidence supports the section 300, subdivision (b), finding against father, we reverse the judgment as to him and remand the matter for the juvenile court to reconsider its disposition orders.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. *The Detention and the Section 300 Petition*

On August 10, 2009, when X.S. was about four months old, the Los Angeles County Department of Children and Family Services (DCFS) received a referral alleging that the child's mother, who lived with the maternal grandmother, had a physical altercation with the maternal grandmother in the child's presence. As a result, mother, then a minor, was placed in a juvenile detention center, and the child was placed in foster care. Mother reported to DCFS that father, then 20 years old, was the child's father, but father denied paternity.

DCFS filed a petition under section 300 on August 13, 2009, against both mother and father. As to mother, the petition alleged under section 300, subdivision (b), that mother had a physical altercation with the maternal grandmother in the child's presence and that she failed to plan for the child's

---

[1] Statutory references are to the Welfare and Institutions Code.

care and supervision. As to father, the petition alleged under section 300, subdivisions (b) and (g), that he "failed to provide the child with the necessities of life including food, clothing, shelter and medical care. Such failure to provide for the child on the part of the father endangers the child's physical and emotional health and safety and places the child at risk of physical and emotional harm and damage."

At the detention hearing that day, which father attended, his counsel requested paternity testing, stating that father "thinks that he may be the father" but "does not know" because mother told him that she had another sexual partner at the time of conception and he and mother ended their sexual relationship by the time she became pregnant. Counsel further represented that father is willing to "step up" if he is determined to be the biological father. The juvenile court ordered paternity testing. It also found a prima facie case for detaining the child in foster care and ordered unmonitored visits for the maternal grandmother and monitored visits for mother and father, although father apparently did not visit with the child pending paternity test results. Several days later, on August 24, 2009, the juvenile court ordered the child detained in the home of his maternal grandmother on the condition that mother not live there when released from juvenile detention.

2. *The Juvenile Court's Paternity Finding and Its Jurisdiction and Disposition Orders*

On December 1, 2009, after receiving the paternity test results, the juvenile court found that Matthew M. is the biological father of X.S. DCFS reported that both mother and father wished to relinquish family reunification services and wanted the child to be placed with his maternal grandmother and that she be granted legal guardianship. But, just weeks later, DCFS indicated, in preparation for the adjudication hearing, that both mother and father had changed their minds and did not want to relinquish family reunification services. According to DCFS, father stated that he had "reconsidered, and would now like to be reunified with his son." Being "very candid," he said "that he feels extremely pressured by paternal grandparents to 'do the right thing' and get custody of [his child]." Father stated, " 'I guess I have no choice. It's already a messed up situation and it's hard. Mostly it's my parents who want this.' " Father admitted that he could not care for the child on his own. He said that, since the results of the DNA test, he moved back with his parents and has been having weekend visits with the child at his

parents' house, and the child spent the last week there. Father reported that, "although he does spend time with the child, it is paternal grandmother who primarily cares for [the child], as [father] has no experience with children. Father indicated that "now that he knows that the child is his, he is willing to participate in services, including a parenting class." According to DCFS, "[p]aternal grandparents remain very supportive of father and have indicated that they are willing to assist father with [the child's] care," while acknowledging that father "is in no position to care for [the child] on his own."

At the adjudication hearing on January 22, 2010, father testified that, after learning in December 2009 that he was the child's biological father, he and his family have been providing for the child and he wants to be an active parent, "raising [the child], feeding him, making sure that he's okay, keeping him, protecting him." Father stated that he knew that responsibility lasted "forever" and that he was willing to be the child's parent forever. He said that his parents were helping him with the child, as he was living with them and currently had no job, and that, in terms of being a long-term provider for the child, "[t]hey want it. They want it just like me."

Father's counsel asked the juvenile court to dismiss the allegations in the petition against father, as no evidence suggested the child had ever been without care and provisions and father has been caring for the child since learning he is the biological father, and requested placement of the child with father, as a nonoffending parent, in the paternal grandparents' home. X.S.'s counsel agreed that the court should dismiss the allegations against father and requested that the court continue disposition to allow for a transition period before the child was placed with father or, alternatively, to proceed with disposition and placement in the maternal grandmother's home for two months with a gradual increase in father's visitation prior to placement with him.

The juvenile court rejected the requests of counsel for both father and the child. Addressing father, the court stated that "father certainly knows that he was involved intimately with the mother around that period of time that would have conceived the child, and gave birth nine months later. I think that you didn't want to be bothered at that time. You didn't believe this was your child, or you should have—maybe you were on notice that perhaps you should have inquired further that this could have been your child since you were in a relationship with the mother around the time the child was conceived. You do have that responsibility, sir, okay. And you're a young man. I understand that and you have a lot of other things going on in your life, but it took the DNA

test to convince you that you were going to step up and now be responsible as a parent. I think that you avoided your responsibility . . . ."

Proceeding to jurisdiction and based on this reasoning, the court found true the allegation against father under section 300, subdivision (b)—that father "failed to provide the child with the necessities of life . . . [, which] endangers the child's physical and emotional health and safety and places the child at risk of physical and emotional harm and damage." The court modified the allegation under section 300, subdivision (b), against mother based on the physical altercation with the maternal grandmother and, as modified, found the allegation true. The court dismissed the allegation under section 300, subdivision (g), against father and the second allegation under section 300, subdivision (b), against mother.

As to disposition, after declaring the child a dependent of the court, the court placed him in the home of his maternal grandmother and ordered family reunification services for both parents. The court found that the child had bonded with his maternal grandmother and that placement with her, rather than with father and his family, was appropriate because changing the child's placement would cause "a substantial risk of detriment to the emotional well-being of the child because of [father's] lack of enthusiasm, and attendance as a father during . . . about eight months of the child's life." The court ordered monitored visitation for mother and overnight weekend visits every other weekend for father, unmonitored in his parents' home and monitored outside the home, with discretion to DCFS to liberalize.

Father timely appealed. (§ 395, subd. (a)(1); see *In re Tracy Z.* (1987) 195 Cal.App.3d 107, 112 [240 Cal.Rptr. 445] [jurisdictional findings reviewable on appeal from the judgment following disposition].)

## DISCUSSION

1. *Requirements for Establishing Dependency Jurisdiction Under Section 300, Subdivision (b)*

As relevant here, section 300, subdivision (b), invokes the jurisdiction of the juvenile court and permits it to declare a child a dependent of the court when "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of . . . the willful or negligent failure of the parent or guardian to provide the child with adequate food, clothing, shelter, or medical treatment . . . ." DCFS has the burden of showing specifically how the child has been harmed or will be harmed. (*In re Matthew S.* (1996) 41 Cal.App.4th 1311, 1318 [49 Cal.Rptr.2d 139]; see *In re*

*Marilyn H.* (1993) 5 Cal.4th 295, 303 [19 Cal.Rptr.2d 544, 851 P.2d 826] [§ 300's purpose is "to limit court intervention to situations in which children are threatened with serious physical or emotional harm"].) To declare a child a dependent of the court under section 300, the juvenile court must find by a preponderance of the evidence that the allegations are true. (*In re Matthew S., supra,* 41 Cal.App.4th at p. 1318; see § 355, subd. (a).) We review the juvenile court's findings under section 300 for substantial evidence and will affirm the judgment based on those findings if they are supported by reasonable, credible evidence of solid value. (*In re Matthew S., supra,* 41 Cal.App.4th at p. 1319.)

> 2. *The Juvenile Court's Conclusion That Dependency Jurisdiction Exists Based on the Allegation Against Father Under Section 300, Subdivision (b), Is Not Supported by Substantial Evidence*

As noted, the allegation against father under section 300, subdivision (b), stated that he "failed to provide the child with the necessities of life including food, clothing, shelter and medical care. Such failure to provide for the child on the part of the father endangers the child's physical and emotional health and safety and places the child at risk of physical and emotional harm and damage." No substantial evidence supports the necessary finding under section 300, subdivision (b), that any failure of father to provide for his son caused the child to suffer serious physical harm or creates a substantial risk that the child will suffer serious physical harm.

█ Father admittedly did not provide for his son until the child was about eight months old when he learned that he is the biological father. Nevertheless, the child did not suffer serious, or for that matter *any*, physical harm as a result, nor did any evidence indicate that father's failure to provide for the child before learning that he is the biological father creates a substantial risk that the child will suffer serious physical harm in the future. Indeed, the evidence is to the contrary. Before father learned that he is the biological father, the child was well cared for in the home of his maternal grandmother, who helped support the child and provided for his necessities. After detention, DCFS reported that "[m]aternal grandmother appears fully committed to providing emotionally and financially for the child." The child received regular care from a pediatrician and was current on his immunizations. DCFS reported that he "appears happy and alert." And DCFS became involved with the child, not because of father's actions, but because of mother's conduct. Although, as the juvenile court concluded, father could have made earlier

attempts to determine whether the child was his son, he appeared at the detention hearing, requested a paternity test and represented that he would "step up" if he were determined to be the child's biological father. And obtaining the paternity test results months after the detention hearing was through no fault of father. Consequently, father's failure to provide for his son before the paternity determination cannot support the juvenile court's true finding on the section 300, subdivision (b), allegation that father's actions endangered or harmed the child, or create a future risk of such harm or endangerment.

Nor do father's actions after learning that he is the biological father support the juvenile court's finding against him under section 300, subdivision (b). In fact, they show that father, although wavering initially, accepted responsibility and quickly committed to provide for his child, by moving to his parents' house, securing financial and emotional assistance from his parents, agreeing to attend parenting classes and spending time with his son. His parents' encouragement that he should "do the right thing" and their help in providing and caring for the child are not negatives. On the contrary, the assistance of father's parents, both financially and emotionally, demonstrates that the child will continue, along with the support of his maternal grandmother, to receive proper care. Father's conduct after learning that he is the biological father, therefore, does not demonstrate any future risk of harm or endangerment to the child and cannot sustain the section 300, subdivision (b), finding against him. As a result, the juvenile court's jurisdictional finding against father under section 300, subdivision (b), must be reversed.

■ Our decision in that regard, however, does not change the child's status as a dependent child of the juvenile court. Apart from the section 300, subdivision (b), finding against father, the child properly is a dependent of the juvenile court based on the sustaining of the section 300, subdivision (b), allegation against mother, which has not been challenged. "[A] jurisdictional finding good against one parent is good against both. More accurately, the minor is a dependent if the actions of either parent bring [him] within one of the statutory definitions of a dependent. [Citations.] This accords with the purpose of a dependency proceeding, which is to protect the child, rather than prosecute the parent." (*In re Alysha S.* (1996) 51 Cal.App.4th 393, 397 [58 Cal.Rptr.2d 494]; accord, *In re Alexis H.* (2005) 132 Cal.App.4th 11, 16 [33 Cal.Rptr.3d 242].) The child thus remains a dependent of the juvenile court.

## DISPOSITION

The judgment is reversed as to father. The matter is remanded for the juvenile court to reconsider its disposition orders consistent with the views expressed in this opinion.

Chaney, J., and Johnson, J., concurred.

On December 13, 2010, the opinion was modified to read as printed above.