Filed 3/11/15  Cassandra M. v. Super. Ct. CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| CASSANDRA M., et al., | B260600 |
| Petitioners, | |
| v. | (Super. Ct. No. CK46066) |
| THE SUPERIOR COURT OF LOS ANGELES COUNTY, | (Marguerite D. Downing, Judge) |
| Respondent; | |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Real Party in Interest. | |

Petitions for Extraordinary Writ:  Denied

  Law Office of Marlene Furth, Melissa A. Chaitin and Christina Samons, under appointment by the Court of Appeal, for Petitioner Cassandra M.

  Law Offices of Katherine Anderson, Jennifer Pichotta and Diana Walch, under appointment by the Court of Appeal, for Petitioner Raymond D.

  Mark J. Saladino, County Counsel, Dawyn R. Harrison, Assistant County Counsel, and William D. Thetford, Principal Deputy County Counsel for Real Party in Interest.

## INTRODUCTION

C.M. (mother) and R.D. (father) of C.D., Ra.D., and S.D., separately petition for extraordinary relief from the juvenile court's jurisdictional and dispositional orders. Mother and father contend that there is insufficient evidence supporting the juvenile court's orders to sustain jurisdictional allegations and to refuse to offer reunification services. We deny the petitions for extraordinary writ.

## STATEMENT OF FACTS AND PROCEDURE

Mother and father have records with Child Protective Services ("CPS") in more than one state. In March 1999, Florida CPS investigated a referral alleging physical abuse by father toward his son J.L. The records identify mother as father's 22-year-old daughter. Mother was pregnant at the time, and father forced her to pretend she was 17 years old so he could collect economic assistance. The investigation showed that father hit his son with a fishing pole and a metal bat, that he was violent with others and with dogs, that he bragged about having killed people, that he was abusive toward mother, and that he threatened mother "if she called [illegible] he would blow them away, her and J[.L.]." The investigation also found that father had previously had children removed from him in Pennsylvania due to abuse. K.M., mother's mother, initially said she was father's wife and the mother of J.L. and mother. She also said father was not the father of mother's baby. The police believed she said this so that father would not be arrested for impregnating a minor. Later, K.M. changed her story and said mother was not her daughter and also that mother was not father's daughter.

When mother gave birth to a son on March 13, 1999, hospital records showed she was 17-years-old. Father told the hospital staff that he was the father of the child, and demanded to sign the birth certificate. He became confrontational and violently shook mother's hospital bed, saying, "I'm going to do what I want to do." However, when a social worker said she would have to call law enforcement because mother was a minor,

2

he changed his story and denied being the child's father. The staff called for security and father left, saying he was going home to get his gun so he could "blow everybody away." The child was removed and later adopted when mother failed to reunify with him. The disposition was "abandonment."

On August 6, 2001, mother gave birth to a girl in Los Angeles County. Both mother and child tested positive for cocaine at the time of birth. The child was removed and later adopted when reunification efforts were unsuccessful. The record later identifies the child's father, Chris G., as father's son and the brother of two of the children involved in this matter.

Mother gave birth to another baby girl in Florida on January 6, 2003. Mother initially said she lived with her father and brother. Later, she said she lived with a friend she met at a homeless shelter. Still later, she said the friend was actually her uncle. Mother reported the uncle's name was Joseph G., but he could not provide an identification to verify his name. The uncle said mother would be living with him and his wife, K.M. Later, he said he did not live in the house and was never married to K.M. K.M., for her part, said they had divorced a year ago. She could not remember Joseph G.'s name and had not seen him in a year. The home was found inadequate, and the child was removed due to "inadequate supervision/caretaker present, inadequate food, and inadequate shelter."

Mother tested positive for cocaine while pregnant in May 2004. On August 5, 2004, she gave birth to another child, who was removed by Florida CPS and adopted.

On April 18, 2013, the Department of Children and Family Services ("DCFS") received a hotline referral alleging general neglect and emotional abuse of three-year-old Ra.D. and six-year-old C.D. by mother and father. The referral indicated that mother and father left the children unattended while they "binge[d] on crack cocaine and alcohol," and that father physically abused mother and "busted mother's head open" in front of the children. The referral further alleged that father beat a dog to near death in April 2012, although mother took the "wrap" and went to jail for a week. Father allegedly beat up the

3

elderly woman who lived in the home at the time because the elderly woman opened the door for the police, resulting in mother's arrest. The referral reported that mother has lost custody of six children and that she gives birth in different states to avoid losing custody of her children.

Child Social Worker ("CSW") Maurice Ukattah investigated the referral. Father, mother, and the children all denied domestic violence, and the children did not appear fearful of mother or father. Mother reported a history of cocaine use but denied any current drug use. She also acknowledged a history of schizophrenia, and agreed to seek mental health services. Father initially denied substance abuse, but later reported that he occasionally uses marijuana for medicinal purposes. He did not have a medical marijuana card. Mother also reported that she was on probation for animal cruelty. Both mother and father stated that mother hit the dog with a newspaper. The incident report indicates that the dog was hit with a bat.

Mother and father told CSW Ukattah that they were homeless and living with a friend. They promised that the friend would contact CSW Ukattah to arrange a home assessment, but the friend never did so, despite repeated inquiries.

Based on the investigation, the allegations were substantiated and the family was offered a voluntary family maintenance agreement. Shields for Family was the lead agency. The parents enrolled in parent education classes, mother began participating in mental health treatment, and both parents agreed to random drug tests. Father consistently tested positive for marijuana. On July 12, 2013, he provided DCFS with a copy of a medical marijuana certificate. He later tested positive for cocaine on September 12, 2014, and then failed to show up for drug tests on September 26, 2014 and October 3, 2014. On July 10, 2013, mother gave birth to S.D.

At a September 23, 2013 team decision meeting, father began to yell and curse when he was asked to complete a live scan.[1] Father said he was depressed and wanted to

---

[1]    "Live Scan is an electronic fingerprinting system that provides a vehicle for quickly checking an individual's criminal background.  (See Health & Saf.Code, §

kill himself. A staff member of the Department of Mental Health who was present asked him to report immediately for mental health treatment, as that was the third time he had threatened to kill himself. Father never showed up. Father was also encouraged to stop using marijuana, as he did not have a medical need for the drugs, and he promised to do so.

At a meeting on September 30, 2013, father asked that the case be closed. He was told that could not happen unless he stopped smoking marijuana in front of the children, submitted to a live scan, participated in random drug testing, and enrolled in mental health counseling. At that point, father became visibly angry, started yelling, and again threatened to kill himself and leave his family.

On October 1, 2013, without any provocation and in front of the children and the CSW, father threatened to kill himself yet again. He said: "I am just tired with the whole thing and feel like killing myself. I will just move out of the house and you all can now deal with her without me because I am not doing any live scan or testing or doing any mental health because I won't be with them and you all can have them if you want." Father left the home after that. Father's name is identified with several aliases that are associated with registered sex offences.

Despite father's claim that he had moved out, the CSW and Shields for Family found father at the home on several home visits. On November 12, 2013, he was found hiding in the closet with no shirt on. When father was found at home on two other occasions, mother insisted he was only visiting the children. Then, during a June 19, 2014, unannounced home visit, mother tried to prevent the CSW from entering the bathroom. The CSW found father nude, hiding inside the bathroom. When the CSW asked father whether he was willing to live scan, father became enraged and threatened to kill himself again. Once again, the children were present. On June 20, 2014, father agreed to enroll in mental health counseling, but continued to refuse to live scan.

1522.04.)" (*Los Angeles County Dept. of Children & Family Services v. Superior Court* (2005) 126 Cal.App.4th 144, 149, fn. 2.)

5

On June 23, 2014, the CSW heard from mother's counselor. The counselor said, "I really do not like what I am seeing lately. You might have to test her for drugs. . . . I know she moved out of the apartment into a motel with three little kids and I don't know what that is about. I noticed that the child and her hygiene is deteriorating fast in the last couple of months." On June 26, 2014, the CSW asked mother to take a drug test and she refused. Mother subsequently failed to show up for drug tests on July 23, 2014, August 18, 2014, and September 3, 2014.

On July 3, 2014, mother and father were served with a removal order. In the presence of four police officers and the children, father began yelling profanities and threats. The children began crying and shivering. Father threatened the CSW: "I will beat your ass wherever I see you and I hope your mother die, you mother fucker bitch."

Following removal, the CSW interviewed C.D. and Ra.D. C.D. denied that she got spanked, but volunteered that her father smokes meth in the bathroom. When asked whether she had ever seen her father smoke meth, she said, "No, my brother Christina told me. My brother name was Chris, but now he is Christina." C.D. confirmed that her brother's last name is G. and that he is father's son. Chris G. is a registered sex offender. When asked when she had last seen him, C.D. said, "in a long time."

When the CSW asked Ra.D. about spankings, however, she said, "Yes, my daddy and mommy spanks me with a belt." Upon hearing this, C.D. yelled, "That is not true." Ra.D. was then taken into a separate office and asked again about spankings. Ra.D. again said she and C.D. were spanked with a belt on their buttocks.

C.D. and Ra.D. were also interviewed about their care and supervision in the home. C.D. said: "We are hungry. We barely eat and my mom don't cook no more because we don't have anything to cook with. My [dad] lives with us and he likes to spank us with a belt if we don't be quiet or when we be bad." As for Chris G., she said, "That is my older brother. His name now is Christina, he is she. He used to stay with us. Now he comes to visit us but he is a she. I saw him last December, 2013." At that point,

6

Ra.D. said, "[T]hat is not right; he came over not too long ago." C.D. told Ra.D. to be quiet.

On July 7, 2014, father and mother were in the DCFS office when father became enraged and violent. He threatened bodily harm to CSW Ukattah and punched the walls in the reception area. DFCS called the sheriffs, who asked the parents to leave. They left, but returned shortly after the sheriffs left. Father again became enraged and threatened to harm CSW Ukattah, frightening the other clients waiting in the reception area. Mother agreed to a live scan, but father said he had no identification and so could not live scan.

After placement with a foster parent, Ra.D. told the CSW and the foster mother, "We loves it here, I don't want to go back. She is my mom now." The CSW told Ra.D. that all would be fine and that they could go home to their mother and father as soon as their parents did what they needed to do, but Ra.D. insisted she wanted to stay and continued to cry until the CSW left.

DCFS filed a petition pursuant to Welfare and Institutions Code section 300[2] on July 9, 2014, alleging (a) the parents physically abused the children, (b) mother had a 13-year history of drug use, (c) mother had three children who were permanently removed due to her substance abuse, (d) father had a history of substance abuse and was a current user of methamphetamine and marijuana, and (e) father had mental and emotional problems, including a history of making suicide threats. The juvenile court detained the children on July 9, 2014. On August 11, 2014, DCFS filed an amended section 300 petition adding allegations that mother suffered from mental and emotional problems, including schizophrenia and active bipolar disorder.

In advance of the jurisdiction hearing, DCFS conducted further investigation and prepared a report. As part of the investigation, mother and father were re-interviewed. Mother acknowledged that she had lost three children because of her substance abuse and

---

[2]     All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

7

that she never completed a substance abuse program. She reported that she began using drugs as a teenager, but claimed that she last used drugs over eight years ago. She stated she was diagnosed with schizophrenia and active bipolar disorder ten years ago, and admitted that she heard and saw things. She talked to her dead mother and aunt, and sometimes saw a pink elephant. Mother and father both denied that father wanted to harm himself or anyone else. They also denied that father ever threatened to harm social workers. Father reported that he had been with mother for 17 years, but denied that he was the father of the three children who had been removed from her custody. The parents' weekly visits with the children were going well.

On July 15, 2014, a multidisciplinary assessment team summary of findings report ("MAT assessment") was completed for S.D., who was one year old at the time. The parents refused to participate in the assessment, and father verbally abused the assessor. The assessment found that S.D. was exposed to father's "daily angry outbursts," including one that happened during a monitored visit. The visitation monitor reported that S.D. presented with a "flat/blunt affect," and that mother "froze with fear" and was unable to protect the child.

The assessment found that S.D. was impaired in her socio-emotional development. She appeared to have been left in a stroller for most of the day and evening, with little or no interaction from the parents. She had a flat/blunt affect and poor eye contact. She was unable to express emotions through words, body language, or facial expression. She would scream and cry when an item was taken from her, and then abruptly shut down as if responding in fear of negative consequences for crying. She was unable to signal when she was hungry or satiated, and did not cry when her parents left. She could not pull herself up to stand or walk while holding onto furniture and could not copy gestures or let go of things without help. Both the assessor and the foster mother observed that S.D. was underactive and would "just sit there with a blank face" and remain unresponsive for hours at a time.

8

At an August 11, 2014 hearing, the court ordered father to submit to a live scan. Father's counsel indicated that father had "no objection" to live scans, but could not do so because he does not have an identification card. The court then ordered that he live scan when he obtains identification. Nonetheless, as of August 26, 2014, father still had not live scanned or obtained identification, even though DCFS had provided him with the reduced rate California identification card application form on three different occasions.

On August 20, 2014, a DCFS investigator contacted the New Jersey Department of Children and Family, and learned that father had three children in New Jersey who had been permanently removed from his custody. Father also had several arrests for possession of controlled substances. In a subsequent letter, the New Jersey Department of Children and Family Services confirmed that the children had been adopted. It explained: "In order for the children to be placed for adoption, both parents must agree to terminate their parental rights. [¶] It appears, according to our records, that while the children were in the care of NJDCF, [father] chose to have little or no interaction with our agencies, in regard to his children."

Based on this information, DCFS filed a second amended petition on August 28, 2014, alleging that father's parental rights to three other children had been terminated. DCFS recommended that both father and mother be denied reunification services. Although father did not testify, his counsel represented that he denied that he is the father of the children identified by the New Jersey Department of Children and Family Services. Father also denied using aliases.

Following a jurisdiction/disposition hearing, the juvenile court sustained the section 300 petition on eight counts alleging physical abuse by father and mother (counts a-2 and b-4), illicit drug use by father and mother (counts b-2 and b-1), mental and emotional health problems on the part of father and mother (counts b-3 and b-6), that mother's three other children were permanently removed from her care due to her illicit drug use (count j-1), and that father's parental rights to three other children had been terminated "as he failed to comply with prior court orders regarding the children" (count

9

j-4).  Count b-2 was amended to reflect that father is a current abuser of cocaine, rather than methamphetamine.

After hearing argument, the juvenile court denied reunification services to both parents, citing section 361.5, subdivisions (b)(10), (b)(11), and (b)(13) with respect to mother and section 361.5, subdivisions (b)(11) and (b)(13) with respect to father.

Father and mother timely filed notices of intent to file writ petitions.  Father challenges the juvenile court's decision to sustain count j-4 and mother challenges the decision to sustain counts b-1 and j-1.  Both argue that the court erred in failing to offer them reunification services.

## DISCUSSION

### A.    Standard of Review

We review the juvenile court's jurisdictional and dispositional findings, as well as its order denying reunification services, under the substantial evidence standard of review.  (*In re P.A.* (2006) 144 Cal.App.4th 1339, 1344; *In re Albert T.* (2006) 144 Cal.App.4th 207, 216; *In re Jasmine C.* (1999) 70 Cal.App.4th 71, 75; *In re Kristin H.* (1996) 46 Cal.App.4th 1635, 1654.)[3]  We resolve all conflicts in support of the determination, examine the record in a light most favorable to the dependency court's findings and conclusions, and indulge all legitimate inferences to uphold the court's order.  (*In re Brison C.* (2000) 81 Cal.App.4th 1373, 1379; *In re Tania S.* (1992) 5 Cal.App.4th 728, 733).

We cannot reweigh the evidence and invoke our judgment over that of the juvenile court.  "It is the trial court's role to assess the credibility of the various witnesses, to weigh the evidence to resolve the conflicts in the evidence.  We have no power to judge the effect or value of the evidence, to weigh the evidence, to consider the credibility of

---

[3]    Some courts have applied the abuse of discretion standard of review to a juvenile court's order denying reunification services.  (See, e.g., *In re Angelique C.* (2003) 113 Cal.App.4th 509, 523-524.)  We apply the substantial evidence standard of review.

witnesses or to resolve conflicts in the evidence or the reasonable inferences which may be drawn from that evidence. [Citation.] Under the substantial evidence rule, we must accept the evidence most favorable to the order as true and discard the unfavorable evidence as not having sufficient verity to be accepted by the trier of fact. [Citation.]" (*In re Casey D.* (1999) 70 Cal.App.4th 38, 52-53.) In our discussion, as required, we refer to the evidence that was submitted that supports the juvenile court's orders.

### B.     Jurisdictional Findings

Father and mother challenge only three of the eight counts sustained by the juvenile court. "'"When a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the [trial] court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence. In such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence.' (*In re Alexis E*. (2009) 171 Cal.App.4th 438, 451.)" (*In re Drake M*. (2012) 211 Cal.App.4th 754, 762.) Moreover, "a jurisdictional finding good against one parent is good against both. More accurately, the minor is a dependent if the actions of either parent bring [him] within one of the statutory definitions of a dependent. [Citations.] This accords with the purpose of a dependency proceeding, which is to protect the child, rather than prosecute the parent.' [Citations.]" (*In re X.S.* (2010) 190 Cal.App.4th 1154, 1161.)

Although this court will exercise its discretion to reach the merits of a jurisdictional finding when it serves as the basis of a dispositional order that is also being challenged or when the finding is prejudicial to the petitioner (*In re Drake M.*, *supra*, 211 Cal.App.4th at pp. 762-673), that is not the case here. The factual bases necessary for sustaining jurisdictional counts under section 300, subdivisions (b) and (j) are not the same as the factual basis necessary for a disposition order denying reunification services

under section 361.5, subdivisions (b)(10), (b)(11), and (b)(13).  We therefore decline to reach the merits of mother and father's jurisdictional findings challenges.

### C.  Denial of Reunification Services

The legislature has recognized that it "'may be fruitless to provide reunification services under certain circumstances.'"  (*Randi R. v. Superior Court* (1998) 64 Cal.App.4th 67, 70, quoting *Deborah S. v. Superior Court* (1996) 43 Cal.App.4th 741, 750.)  Thus, under section 361.5, subdivision (b), the law provides in part: "Reunification services need not be provided to a parent or guardian described in this subdivision when the court finds, by clear and convincing evidence, any of the following:  [¶] . . . [¶] (10) That the court ordered termination of reunification services for any siblings or half siblings of the child because the parent or guardian failed to reunify with the sibling or half sibling after the sibling or half sibling had been removed from that parent or guardian . . . is the same parent or guardian described in subdivision (a) and that, according to the findings of the court, this parent or guardian has not subsequently made a reasonable effort to treat the problems that led to removal of the sibling or half sibling from that parent or guardian. [¶] (11) That the parental rights of a parent over any sibling or half sibling of the child had been permanently severed, and this parent is the same parent described in subdivision (a), and that, according to the findings of the court, this parent has not subsequently made a reasonable effort to treat the problems that led to removal of the sibling or half sibling of that child from the parent.  [¶] . . . [¶]  (13) That the parent or guardian of the child has a history of extensive, abusive, and chronic use of drugs or alcohol and has resisted prior court-ordered treatment for this problem during a three-year period immediately prior to the filing of the petition that brought that child to the court's attention, or has failed or refused to comply with a program of drug or alcohol treatment described in the case plan required by Section 358.1 on at least two prior occasions, even though the programs identified were available and accessible."

12

### 1. *Denial of Reunification Services to Mother*

Substantial evidence supports the juvenile court's decision to deny reunification services to mother under subdivisions (b)(10), (b)(11), and (b)(13) of section 361.5. Mother cites *In re D.H.* (2014) 230 Cal.App.4th 807. In that case, the court held that failure to reunify in the past with other children was not sufficient to deny reunification services. But here, there is much more evidence supporting the juvenile court's order.

Mother admitted that she started using drugs as a teenager and that three other children were permanently removed from her care because of drug problems. She also admitted that she has never been in a drug treatment program. Although she tested negative for drugs initially, she refused or failed to show up for four drug tests between June and September 2014. Each missed drug test is "properly considered the equivalent of a positive test result." (*In re Christopher R.* (2014) 225 Cal.App.4th 1210, 1217.) These missed drug tests all occurred after mother's counselor informed the CSW, in June 2014, that she had become concerned about the mother and the child's hygiene, and suggested that mother be tested for drugs. Shortly afterward, on July 3, 2014, the child C.D. told the CSW that she and her siblings "are hungry" and "barely eat" because mother "don't cook no more because we don't have anything to cook with." As such, the record contains evidence that mother (1) failed to reunify with siblings or half-siblings of the children and failed to make a reasonable effort to treat the underlying problem (section 361.5, subdivision (b)(10)), (2) lost parental rights over the children's siblings or half-siblings and failed to make a reasonable effort to treat the underlying problem (section 361.5, subdivision (b)(11)), and (3) has an extensive history of drug use and has resisted prior court-ordered treatment (section 361.5, subdivision (b)(13)). There is substantial evidence supporting the juvenile court's refusal to provide reunification services to mother.

Mother cites *In re D.H., supra,* 230 Cal.App.4th at page 815, which held that in that case "the record . . . does not contain substantial evidence to support the trial court's denial of services on the basis that father had not made reasonable efforts to treat the

13

problems which led to the removal of the minors' half siblings."  In the instant case, there is substantial evidence that mother has not made the required reasonable efforts to treat the problems that led to the removal of other children.

## 2. *Denial of Reunification Services to Father*

Substantial evidence also supports the juvenile court's decision to refuse reunification services to father under subdivisions (b)(10) and (b)(11) of section 361.5. There is evidence that father had three open cases with the New Jersey Department of Children and Family Services and failed to reunify with all three children, who were subsequently adopted.  The New Jersey Department of Children and Family Services' files on the matter show that father had arrests for possession of controlled substances, and that he "chose to have little or no interaction with [the] agencies, in regard to his children."  This evidence reasonably suggests that father's children were removed because of a substance abuse problem, and because he failed to cooperate with the New Jersey Department of Children and Family Service in making efforts to reunify.

There is evidence that father has not made reasonable efforts to treat these problems.  The family received family maintenance services for over a year before DCFS filed its section 300 petition.  During this time, father consistently tested positive for marijuana, even though he had promised to stop using marijuana because he did not need it.  After the section 300 petition was filed, he tested positive for cocaine on September 12, 2014, and then failed to show up for drug tests on September 26, 2014, and October 3, 2014.  (See *In re Christopher R.*, *supra*, 225 Cal.App.4th at p. 1217 [missed drug test is "properly considered the equivalent of a positive test"].)  There is evidence that he has failed to cooperate with DCFS or Shields for Family.  Specifically, there is evidence that he has refused to submit to a live scan despite repeated requests and a court order; he punched the walls in the DCFS office and threatened social workers on multiple occasions; and he repeatedly threatened to kill himself when asked to live scan or otherwise cooperate with the agencies.

14

Father argues that there is no evidence to establish that he is the father of any other child or that any other child of his is a dependent of the New Jersey juvenile court. We disagree. The New Jersey Department of Children and Family Services' records indicate that father has three open cases in New Jersey. Although father disputes this through counsel, he did not testify and submitted no evidence to that effect. If the New Jersey Department of Children and Family Services identified him in error, father easily could have established that fact by submitting to a live scan. He has not done so despite multiple requests and a court order directing him to live scan.

### D.    Best Interests of the Children

Even when subdivisions (b)(10), (b)(11), or (b)(13) of section 361.5 apply, the juvenile court still may order reunification services if it determines, by clear and convincing evidence, that reunification is in the best interests of the children. (§ 361.5, subd. (c).) It is the parents' burden to show that reunification services would be in the best interests of the children. (*In re Gabriel K.* (2012) 203 Cal.App.4th 188, 197.)

There is sufficient evidence to support the juvenile court's decision. There is evidence showing that C.D., Ra.D., and S.D. have been detrimentally affected by their parents' behavior and general neglect. All three children were exposed to father's angry outbursts on a daily basis. During these outbursts, mother "froze with fear" and was unable to protect her children from them. The evidence is that C.D. and Ra.D. shivered and cried during father's angry tirades, while one-year-old S.D. presented with a "flat/blunt affect." The MAT assessment found that this home environment and her parents' neglect had left S.D. significantly impaired in her socio-emotional development. Meanwhile, mother had stopped cooking, leaving her children hungry and "barely eat[ing]."

It does not appear that these significant issues will be ameliorated by reunification services. The evidence set forth above supports the juvenile court's decision. Records of father's violence tendencies and angry outbursts date back to at least 1999, when he

15

became violent and confrontational with hospital staff over whether he would be allowed to sign the birth certificate of mother's child, as the child's father. Mother appears to have a history of covering for father's transgressions. Although it was father who beat a dog to near death in 2012, it was mother who took the blame and went to jail. After father became angry and told social workers he would move out of the home rather than undergo a live scan and family preservation services, mother repeatedly insisted that father no longer lived in the home, even though social workers found him hiding in the closet and bathroom during home visits. Mother and father have records with the state child welfare agencies in multiple states, and most of these cases have resulted in permanent removal of their children. In fact, the family received family preservation services for over a year before DCFS filed its section 300 petition. If anything, it appears the situation worsened over this time. This history suggests that reunification services are unlikely to be successful. (See *In re William B.* (2008) 163 Cal.App.4th 1220, 1228-1229 ["at least part of the best interest analysis must be a finding that further reunification services have a likelihood of success"].)

Although the children may be bonded to their parents, that bond alone is not sufficient to justify reunification. (See *In re William B.*, *supra*, 163 Cal.App.4th at p. 1229.) Moreover, there is evidence that the children have thrived since removal from the home. After placement with a foster parent, Ra.D. told the CSW and the foster mother, "We loves it here, I don't want to go back. She is my mom now." When the CSW told Ra.D. that she would be able to go home to her mother and father soon, Ra.D. insisted she wanted to stay and cried.

Based on the record, we conclude that substantial evidence supports the juvenile court's decision to bypass reunification services and set a hearing pursuant to section 366.26.

**DISPOSITION**

The petitions are denied.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

MOSK, J.

We concur:

TURNER, P. J.

GOODMAN, J.[*]

---

[*]    Judge of the Superior Court of the County of Los Angeles, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.