Filed 5/28/21  In re D.G. CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re D.G. et al., Persons Coming Under the Juvenile Court Law. | B308526 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>S.M.,<br><br>        Defendant and Appellant. | (Los Angeles County Super. Ct. No. 20CCJP03167A-B) |

APPEAL from an order of the Superior Court of Los Angeles County, Stephen C. Marpet, Judge Pro Tempore. Affirmed.

Elizabeth Klippi, under appointment by the Court of Appeal, for Defendant and Appellant.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, and Aileen Wong, Senior Deputy County Counsel, for Plaintiff and Respondent.

The juvenile court sustained a dependency petition against S.M. (Mother) and D.G., Jr. (Father). (Welf. & Inst. Code, § 300.)[1] Father has not appealed. Mother challenges the jurisdictional findings against her. She admits that Father has been violent for years and tried to run her over with his car. She continued their relationship and her children witnessed recent altercations. The record supports a finding that the children are at risk of serious harm because Mother failed to protect them from domestic violence. We affirm.

## FACTS AND PROCEDURAL HISTORY

Mother and Father are the parents of D.G. (born in 2009) and D.G.'s sister (born in 2013) (Sister). Mother said the couple's relationship ended in April 2019 but they continued sexual intimacy, which she acknowledged may have misled Father. Father said "it was unclear to him that the relationship had ended as Mother allowed him to reside in the home and he believes he was receiving 'mixed messages.'"

In 2017, D.G. told school staff that both parents hit him with a belt, leaving marks; Father "hit him with a belt really hard" when he was four. Father grabbed D.G. by the shirt and yelled at the eight-year-old to "get[ ] his life together," nearly choking him. The parents denied corporal punishment and the child abuse referral was deemed unfounded.

On May 27, 2020, police received a 911 call that "a lady needs help."[2] Officers found Mother with bruises on her neck, ribs, and arms. She said she and Father argued. When she tried

_____

[1] Undesignated statutory references are to the Welfare and Institutions Code.

[2] Undesignated dates refer to the year 2020.

to leave, Father grabbed her arm and hair, pulled her to the floor, got on top of her, and started to strangle her. The children witnessed the altercation. D.G. separated his parents during Father's attack. As Mother tried to escape, Father grabbed her hair again and pulled her to the floor. She freed herself and ran outside, yelling for help.

Mother told police that Father threatened to kill her; possessed a firearm; tried to strangle her; and she fears for her safety. She received an emergency protective order.

Respondent Department of Children and Family Services (DCFS) investigated. Mother told the case worker (CSW) that Father came to visit and demanded to know why they could not be together. When she tried to leave, Father smacked a phone from her hand, blocked her exit, and started choking her. Father prevented her from opening the door and started hitting her. She ran down the street screaming for help. When she returned to the house, the children were getting in Father's car. They said they wanted to go with him, so she let them leave. Mother allows Father to visit the children if she is present.

Mother said Father has attacked her three times in her current home and sprayed her with Lysol. Law enforcement was called. She was evicted from her prior residence after Father pointed a gun at neighbors. Usually the children are asleep during domestic disputes, although they were awake and present when Father attacked her on May 27.

Sister (age 6) told CSW that Father tried to choke Mother from behind on May 27. Mother told the children to pack. The parents continued to fight and say bad words. It was not the first time she saw her parents fighting. Their fights make her feel sad. Sister is disciplined with "whoopings."

D.G. (age 11) said his parents argue regularly. Early in May, they argued about D.G.'s homework. The next week, they argued over food; Mother left the home and did not return for two days. Their final argument in May was the worst. They began "tussling" over Mother's phone and hit each other. Father grabbed Mother's neck from behind. She tried to leave but Father prevented her going outside. As Mother escaped, D.G. asked her not to call police on Father. The children left with Father. Father took their phones so no one could call police. D.G. said that "since Father has not been in the home . . . his Mother has not been yelling as much."

D.G. is confused because the parental arguments "are about nothing." When Father complains to D.G. that Mother has boyfriends, D.G. tells him "Mother is a grown woman and that she is going to do what she wants" and also that "it was okay if Mother did not want to be with [Father]." D.G. stated that Mother's "whoopings" do not leave bruises.

The maternal grandmother (MGM) does not believe Father would physically harm the children. Instead, he engages in psychological trickery by telling them bad things about Mother. MGM said this was not the first instance of domestic violence. In the past, Father tried to run over Mother with his car. He came to MGM's house and damaged her car.

On June 8, the court ordered the children's removal from Father. They remained in Mother's care.

A petition was filed. As amended, it alleges that Mother and Father have a history of engaging in violent physical altercations in the children's presence. On May 27, Father struck and choked Mother and inflicted bruises on her neck, ribs, and arms. On prior occasions, Father sprayed Mother with cleaning

4

fluid and attempted to run her over. Mother failed to protect the children by giving Father unlimited access to them. Father's violent conduct and Mother's failure to protect endanger the children's health and safety and places them at risk of serious harm. Father has a history of illicit drug abuse and currently abuses marijuana, making him incapable of providing regular childcare. He possessed a firearm within the children's access, endangering their health and safety.

At the June 17 detention hearing, the court found Father to be a presumed parent. The court found good cause to detain the children and issued a temporary restraining order. Father cannot harm Mother or the children and must stay at least 100 yards away from them except during monitored visits with the children. The parents were ordered not to say derogatory things about each other to the children.

In the jurisdiction report, DCFS stated that Father has been arrested 10 times between 1995 and 2019, including arrests in 2001 and 2019 for battery on a cohabitant. D.G. reported that he and his sister do homework or don headphones to avoid hearing parental arguments. Though D.G. denied seeing altercations, he admitted that law enforcement has come to the home. Sister denied knowing anything about the allegations in the petition and said her parents are "nice" to each other.

Father called Mother "dramatic" and blamed her outbursts on her menstrual cycle. He denied trying to run her over and said he was just moving his car. He accused a former girlfriend of falsely having him arrested for domestic violence in 2001. He claimed he never engaged in physical altercations. He agreed that he uses marijuana but denied using PCP. He admitted

5

having an unregistered gun at home, which he tried to hide when police arrived. Mother knew Father had a gun at home.

Mother told DCFS that when D.G. was about three, Father became jealous and argumentative and accused her of being unfaithful. A year later their verbal disputes escalated into physical aggression. Their arguments caused her to be evicted from her apartment. While she was living with MGM, Father learned she was in another relationship and tried to run her over with his car.

In 2019, Mother called police when Father sprayed her with Lysol. He uses her menstrual cycle as an excuse for his behavior. Father normally came to her home daily to take the children to school. He would often argue with her.

On May 27, Father came to visit, as she allowed him to do. She was preparing dinner and Father ate her portion. Mother decided to leave to avoid a confrontation. As she retrieved her belongings, Father knocked the phone from her hand and assaulted and choked her. When D.G. saw Father pin Mother to the floor, Father feigned innocence and Mother ran outside.

D.G. told Mother he will not cooperate with DCFS. He wants to see Father, fears Father is "in trouble" and believes that CSW's are keeping him away. In the past, D.G. asked Mother not to contact police. Father came to the family home on September 22, in violation of the restraining order. Mother told him to leave and called police.

MGM reported that two or three years earlier, Father argued with Mother. When Mother tried to enter MGM's house, Father "attempted to run her over with his car." The children suffer from being in the middle of the conflicts. Father badmouths Mother and causes the children to "guilt trip" Mother

into allowing him to visit. Father's godmother said Mother and Father love each other and want to reconcile. She is unaware of physical altercations. She denied that Father has a history of aggression, criminality, or substance abuse.

Police logs showed Mother's reports of domestic violence. In April 2019, Mother called police because Father grabbed her by the neck and hair; in September 2019, Father locked himself in the bathroom with Mother's purse and she feared the situation would escalate; the following April and May, Father prevented Mother from leaving and took her purse. The 2020 police reports state that Father is "constantly under the influence of PCP and attempts to fight with officers."

DCFS opined that the children are safe with Mother and face a "moderate" risk of future abuse or neglect without DCFS intervention. She now calls police when Father violates the restraining order, provides the children with a clean, safe home, changed the locks to the home, plans to get a permanent restraining order, and will restrict Father's access to the children. Father's domestic violence poses a risk of harm to the children. The parents engaged in violence in the children's presence. They saw Father choke and hit Mother. They are sad and confused by the parental fighting.

Father did not visit the children since detention (four months earlier) because he objected to his visits being monitored. DCFS encouraged him to visit and the children requested it. He declined to participate in drug tests. The report noted that Mother exposed the children to domestic violence for seven years by allowing Father in her home.

After DCFS filed the jurisdiction report, Mother was not at home whenever CSW came to check on the family and she

disconnected her phone.  Father did not visit the children or return calls from DCFS.

The petition was adjudicated on October 28.  DCFS and minors' counsel asked the court to sustain the petition in its entirety.  While admitting to "a history of violence with the father," Mother asked the court to strike allegations that she failed to protect the children because she "acted appropriately since this case has been open."  Father denied any domestic violence, use of marijuana in the children's presence, failure to safely store his gun, or current risk to the children.

The court sustained the petition.  It found that Mother continues to aid Father, creating a current risk of harm.  It removed the children from Father's custody and placed them with Mother.  Both parents were ordered to complete domestic violence programs and individual counseling.  Father must test for drugs.  His visits are monitored.  The children must participate in counseling.  The court issued a permanent restraining order protecting Mother and the children.

## DISCUSSION

Mother must demonstrate that no substantial evidence supports the court's jurisdictional findings.  (*In re D.B.* (2018) 26 Cal.App.5th 320, 328–329.)  Without reweighing the evidence or evaluating witness credibility, we resolve all conflicts in favor of respondent and draw all reasonable inferences in support of the judgment.  (*Ibid.*; *In re R.T.* (2017) 3 Cal.5th 622, 633.)

Dependency jurisdiction exists regardless of the merits of Mother's appeal.  A child " 'is a dependent if the actions of either parent bring [him] within one of the statutory definitions of a dependent.' "  (*In re X.S.* (2010) 190 Cal.App.4th 1154, 1161.) "Because the juvenile court assumes jurisdiction of the child, not

the parents, jurisdiction may exist based on the conduct of one parent only." (*In re J.C.* (2014) 233 Cal.App.4th 1, 3.) The court sustained the petition based on the conduct of both parents. Father did not appeal; thus, the court has jurisdiction over the children and we may decline to address the evidence supporting the findings against Mother. (*Id*. at pp. 3–4.)

Mother argues that her claim is justiciable, even if the court has dependency jurisdiction based on the sustained petition against Father. She asserts that the findings against her could prejudicially impact future dependency proceedings. (*In re Drake M.* (2012) 211 Cal.App.4th 754, 762–763.) We exercise our discretion and review the findings against Mother. (*Ibid*.)

The juvenile court has jurisdiction if a child "has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child." (§ 300, subd. (b)(1).) When domestic violence is alleged, the courts may find jurisdiction if there is a pattern of past domestic violence and a risk it will recur. (*In re Daisy H.* (2011) 192 Cal.App.4th 713, 717.)

This court has concluded that jurisdiction lies if there is a history of parental violence and the children witness a recent altercation. (*In re V.L.* (2020) 54 Cal.App.5th 147 [father struck mother with his car].) This is true if the mother and father are separated but their relationship is unresolved. (*Id*., at p. 157.)

Father said his relationship with Mother continues; she agrees they are intimate. He frequented her house despite a long history of violence, including a 2019 attack in which he grabbed her neck, multiple altercations in 2020, and his attempt to run her over. She was evicted from a prior residence after Father

9

pointed a gun at neighbors. His most recent attack on Mother precipitated this dependency proceeding. The facts are not similar to *In re Jonathan B.* (2015) 235 Cal.App.4th 115, 120 [father hit mother twice in five years] or *In re M.W.* (2015) 238 Cal.App.4th 1444, 1450 [single incident of domestic violence occurred seven years before a petition was filed].

DCFS became involved after the children saw Father choke and hit Mother. Mother allowed Father to drive away with the children following his attack. Police documented bruising on Mother's neck, ribs, and arms. She told police he threatened to kill her and she fears for her safety.

Contrary to Mother's claim, she was not "protective every step of the way." The children were so inured to parental fights that they donned headphones to block out the noise. D.G. said his parents battle constantly "about nothing." At age 11, he had to be the adult and remind Father that Mother is a grown woman who can do as she pleases. D.G. separated his parents when Father tried to strangle Mother, placing the child at risk of being hit. Both children normalize dangerous behavior, choosing to protect Father over cooperating with DCFS.

There is no evidence Mother sought counseling for herself and the children, until DCFS intervened. She occasionally called police for help, then promptly allowed Father to reenter her home and victimize her at will. Father had no insight into his violent behavior and denied wrongdoing. While this matter was pending Mother disconnected her phone and did not make the children available for DCFS welfare checks.

Mother endangered the children by repeatedly exposing them to domestic violence. They saw Mother get hit and choked. "Children, even when they are not physically assaulted, very

10

often suffer deep and lasting emotional effects" from domestic violence.  (§ 18290.)  "Even if a child suffers no physical harm due to domestic violence, a 'cycle of violence between . . . parents constitute[s] a failure to protect [a child] "from the substantial risk of encountering the violence and suffering serious physical harm or illness from it." ' "  (*In re V.L., supra,* 54 Cal.App.5th at p. 156.)

Given Mother's longstanding tolerance of Father's abuse, " '[p]ast conduct [was] probative of current conditions' " because "there is reason to believe that the conduct will continue."  (*In re S.O.* (2002) 103 Cal.App.4th 453, 461; *In re Giovanni F.* (2010) 184 Cal.App.4th 594, 599–601 [father was violent throughout his relationship with mother].)  The record supports the sustained findings against Mother and Father.

## DISPOSITION

The order is affirmed.

**NOT TO BE PUBLISHED.**


LUI, P. J.

We concur:


CHAVEZ, J.


HOFFSTADT, J.