Filed 6/12/15  In re T.T. CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re T.T., a Person Coming Under the Juvenile Court Law. | B256313 |
| _____ LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. DK01252) |
| Plaintiff and Respondent, | |
| v. | |
| CATHERINE L., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Emma Castro, Commissioner.  Marilyn Mordetzky, Referee.  Affirmed.

Cristina Gabrielidis, under appointment by the Court of Appeal, for Defendant and Appellant.

Mark J. Saladino, County Counsel, Dawyn R. Harrison, Assistant County Counsel, Jacklyn K. Louie, Principal Deputy County Counsel, for Plaintiff and Respondent.

_____

Presumed mother Catherine L. (Catherine) appeals jurisdictional and dispositional orders declaring T.T. a dependent child and removing him from her custody.  We

conclude that the court's orders were supported by substantial evidence, and thus we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.

### Detention

T.T. (born December 2003) came to the attention of the Department of Children and Family Services (DCFS) on September 3, 2013, when officers stopped a car driven by Catherine, also known as S.T., in which T.T. was a passenger. Catherine initially refused to disclose her name and she said she was a United States diplomat and an international ambassador for the Supreme Heavenly Light Facilitator. Catherine's car did not have a license plate, and Catherine gave the officer a hand-made plaque saying the vehicle was a mobile embassy vehicle. Catherine claimed to be exempt from all California laws. When the police officer asked T.T. a question, Catherine told him not to answer and to "only talk to mommy." Law enforcement fingerprinted Catherine and, after determining that she had an outstanding warrant from 2004 in connection with a charge of kidnapping, arrested her and placed her in custody.

In an interview with the children's social worker (CSW), Catherine claimed her real name was S.T. and that "Catherine" was her older sister. Catherine said she was T.T.'s biological mother, and Pablo F., also known as Pt.T., was T.T.'s biological father. Catherine said she had home-schooled T.T. since he reached school age, and she denied any prior DCFS history.

T.T. told the CSW that he did not know his mother's or father's real names, and said he called them "mom" and "dad." He denied being physically abused and said he was not upset by Catherine's incarceration. He appeared healthy. He was detained and placed in foster care.

A review of DCFS's records revealed that in 2002, Pablo's three children (born to a different mother) had been detained in connection with allegations that Catherine severely emotionally abused them. The children were placed with their mother, Pablo was granted monitored visitation, and Catherine was ordered not to have any contact with

2

the children. The same year, Catherine and Pablo were arrested and convicted of kidnapping Pablo's children from their mother's home.[1]

DCFS filed a juvenile dependency petition on September 6, 2013. The petition alleged jurisdiction over T.T. pursuant to Welfare and Institutions Code[2] section 300, subdivisions (b) and (g) on the grounds that Catherine was incarcerated on September 3, 2013, and failed to make an appropriate plan for T.T.'s care and supervision. The juvenile court found a prima facie case for detaining T.T. and ordered him temporarily placed in foster care.

## II.

### T.T.'s Parentage

A deputy sheriff interviewed Ericka P., who was subsequently determined to be T.T.'s biological mother, on September 13, 2013. Ericka said she met Catherine and Pablo, whom she knew as S.T. and Pt.T., in 2002. In 2003, S.T. and Pt.T. "began to give her guidance. They were on a higher spiritual level. They were helping her to walk the path. They started meeting regularly. [S.T.]'s mother Virginia was present at some of the meetings. They learned that [Ericka] was pregnant. She was in a difficult time in her life. She was separated from her other two children. She had financial issues. She was having trouble spiritual[ly]. She said that on a spiritual level she was told by [S.T.] that she was carrying [S.T.]'s child. She had a vision that she was a surrogate mother for [S.T.]. She was being guided on her path by [S.T.]. She said that her life is guided, when she is given guidance she follows it. This child was a special spiritual child. [She believed] [t]hat [S.T.] and [Pt.T.] being of a higher spiritual level could raise him better.

---

[1] When the children were located at Catherine and Pablo's home, Catherine accused the officers of trespassing and refused to let them in the house. The standoff ended only when officers forced the door open with a hook and ram and forcibly removed the children.

[2] All subsequent undesignated statutory references are to the Welfare and Institutions Code.

She said it was like the 'Dalai Lama.' She gave birth to a boy. Her boy was born at [S.T.]'s home in Compton. [S.T.] was the only person present at the birth."

DNA reports dated September 2013 excluded Catherine as T.T.'s biological mother, and indicated that Ericka was nearly 30,000 times "more likely . . . when compared to a random woman" to be T.T.'s biological mother.

On September 23, 2013, Catherine was charged with the felony kidnapping of T.T.

On September 27, 2013, the court ordered the dependency petition amended to identify Ericka as T.T.'s biological mother. It found with respect to the amended petition that substantial danger existed to T.T.'s physical and emotional well-being and no reasonable means existed to protect him without removing him from Ericka. The court appointed counsel to assist Catherine in filing a motion to be declared T.T.'s presumed mother, and it ordered that Catherine was not to have any contact with T.T. until her legal status was determined.

## III.

## Presumed Mother Proceedings

On October 22, 2013, Catherine filed a motion to be declared T.T.'s presumed mother. Counsel for DCFS and T.T. opposed the motion.

On December 19, 2013, the juvenile court granted Catherine presumed mother status. Although the court found the case troubling, it said Catherine met the legal criteria to be declared T.T.'s presumed mother. The court subsequently granted Catherine limited monitored visitation with T.T. in a therapeutic setting.

## IV.

## Jurisdiction and Disposition

A.    *Jurisdiction/Disposition Report*

The jurisdiction/disposition report, dated October 23, 2013, said T.T.'s biological mother, Ericka, did not wish to have custody of T.T. She refused to provide any information about T.T.'s biological father.

Catherine said she and Pablo had divorced about three years earlier, after Pablo suffered a mental breakdown. She said she kept Pablo involved in T.T.'s life, but Pablo

4

was not capable of caring for T.T. Catherine believed she was competent to home-school T.T. because she used to be a substitute teacher, and she reported he was working at a second grade level.

With regard to Catherine's criminal history, the report said that during the proceedings in connection with her 2002 kidnapping arrest, Catherine had been "disruptive and there was a doubt as to her mental competence. A 730 evaluation was ordered to assess her competence, but [Catherine] refused to cooperate with the assessment. The report was inconclusive and [Catherine] was ordered to serve a 15-20 day psychiatric evaluation. On 12/02/2002, [Catherine] entered a guilty plea and was found mentally competent to proceed. She was sentenced to serve 5 years formal probation and 270 days in jail with credit. [Catherine] was eligible to have the matter dropped to a misdemeanor after serving three years of probation. [O]n 10/23/2003, an additional 181 days in jail were added to the sentence and she was ordered to report for [p]robation. [Catherine] failed to report and a no bail warrant was issued on 05/18/2004. On 09/03/2013, [Catherine] was picked up for the warrant during a traffic stop and when she appeared in Court, her probation was extended to 09/05/2017."

T.T.'s foster mother, Monica, said she greatly enjoyed having T.T. in her home and found him to be a very polite and sweet child. He had no behavioral problems. However, T.T. could barely read and struggled with basic math. T.T.'s classroom teacher gave a similar report. She said he got along well with his peers and was very respectful towards others, but performed academically well below grade level. She said T.T. could recognize numbers, but she was not sure that he could add or subtract and he was reading at a first grade level.

A mental health assessment reported that T.T. was friendly and outgoing and was not exhibiting any problems at home or at school. When asked about his foster care placement, he said he liked living with foster mother Monica and said he thought he would live with her forever. He said he felt "good" about this plan. When asked his thoughts about seeing Catherine, T.T. said, " 'Usually, I don't try to push anything. I just let it go, see how it goes. I know she's okay, so . . .' When [the therapist] [asked] what

5

he meant, T.T. confirmed that as long as he felt that his mom was safe, he was okay with that and okay whether he was able to visit her or not."

Based on the foregoing, DCFS recommended that the court sustain the amended petition. It noted that although Catherine could have been honoring Ericka's wishes in taking T.T., "once the child was given to her, she failed to take any steps to obtain legal custody of him, further compromising his identity and their lives together. [Catherine] has established a life for herself and the child rooted in the idea that the truth would never be revealed. She has misled T.T. into believing that their life together is genuine and that she has a legal claim to him as his mother. [Catherine] has made it difficult for T.T. to live a normal life."

DCFS filed an addendum report dated November 4, 2013. It said that on October 17, 2013, Catherine pleaded guilty to a count of false impersonation and the kidnapping charge against her was dismissed. The detective assigned to the case said the kidnapping charge had been dismissed because the biological mother, Ericka, had not appeared to testify; however, should Ericka come forward with additional evidence, the department would assess whether further criminal charges would be appropriate. The detective also reported receiving a call from Ericka on October 22, 2013, in which Ericka said Catherine had asked for her assistance in creating false adoption papers to legitimize her custody of T.T. Ericka said she now believed Catherine had acted fraudulently to take T.T., but that she was not ready to come forward and make that allegation.

On October 22, 2013, the CSW told T.T. that Catherine was not his biological mother. T.T. said he was surprised, and he disclosed for the first time that Catherine spanked him when she was angry, usually with a belt. He said the spankings were "not hard enough to harm me, just to hurt me." When asked whether Catherine ever embarrassed him as a form of discipline, he said she once made him go outside in a ripped shirt so others could see him. He also said that he "didn't really have any feelings about" not seeing Catherine again; he subsequently said he did not want to see her again "because she'd spank me or hit me. Sometimes she'd make me do push-ups or squats or

6

something like that." He said he preferred living with his foster mother because she cared more for him and let him be more of a child.

B.     *Second Amended Petition*

DCFS filed a Second Amended Petition on January 13, 2014. As subsequently amended, it alleged: Catherine disciplined T.T. by striking him with a belt, requiring him to exercise excessively, and forcing him to wear a ripped shirt in public (a-1, b-6); Ericka abandoned T.T. to the care of her spiritual advisor, Catherine, who had an outstanding warrant for child stealing (b-1, g-1); Pablo created a detrimental and endangering situation for T.T. by allowing Catherine unlimited access to him and by failing to provide him care and supervision (b-2, g-2); Catherine failed to establish a legal plan of custody for T.T. and failed to enroll him in school, hindering his academic growth and development (b-3); Catherine was convicted in 2002 of child stealing and failed to comply with the terms of her release, resulting in a warrant for her arrest (b-4).

C.     *Addendum Reports*

A February 3, 2014 addendum report said Catherine denied forcing T.T. to wear a ripped shirt, using excessive exercise as a form of discipline, or physically disciplining T.T. other than on one occasion. She claimed to have learned of Ericka's pregnancy only a few weeks before T.T. was born, and said she had not known Ericka was going to give her T.T. She said she kept T.T.'s identity secret because Ericka "begg[ed]" her to. She claimed to have taken T.T. for some medical care, but could not provide any specific information. She said she did not have any medical insurance for T.T. because he did not have a social security number.

T.T.'s medical reports said he had untreated asthma and had not received any immunizations. T.T.'s therapist, Dr. Juterbock, urged that it was not in T.T.'s best interests to participate in conjoint therapy with Catherine. Subsequently, Dr. Juterbock reported that during a joint session on February 3, T.T. asked that Catherine sit on a couch and that he sit next to the therapist with his back to Catherine. T.T. asked that Catherine be in the therapy room for only five minutes. During the session, Catherine told T.T. that "she is his mommy, that mother did not abandon him, that there is

7

information [T.T.] is not aware of, and that she loves him. [T.T.] spent the time coloring, remained silent, and continued to face his back towards [Catherine]." After Catherine left the session, T.T. said he " ' did not listen to her' " and " 'blurred her out.' " He asked if the next session could be only four minutes and if he could wear earplugs.

During the next joint session, T.T. again asked to sit with the therapist with his back to "the other lady" (Catherine), and asked the therapist to ask " 'the other lady' " to " 'be quiet' " if she attempted to talk to him. Catherine sat on the couch, but told T.T. " 'mommy is here' " and " 'mommy is fighting for you.' " T.T. asked that Catherine leave the session after five minutes. Subsequently, the foster mother reported that Catherine had waited for them in the parking lot. The therapist opined that it was in T.T.'s best interest to discontinue conjoint therapy and asked that any further visits between Catherine and T.T. take place in a different setting "so [the] therapist can focus on [T.T.'s] individual needs during his therapy."

In a March 6, 2014 "Last Minute Information for the Court," DCFS advised that since the last court order, there had been two DCFS-supervised visits between Catherine and T.T. During the first visit, on February 24, T.T. sat with his back to Catherine and refused to speak to her or answer her questions. He acknowledged that he was upset with her by shaking his head, but he refused to explain why. After 40 minutes, T.T. told the CSW he was uncomfortable and the visit was concluded. He subsequently told the CSW he was unhappy about the visits, did not like being asked to speak up in front of Catherine, and did not want to return to her because she was physically abusive. A second DCFS-supervised visit took place on March 4. T.T. again chose to sit with his back to Catherine. Catherine "informed T.T. that she brought [some of his belongings] and he would have to turn around to take them from her. . . . T.T. indicated he did not want the items. [Catherine] pointed out that T.T. knew better about how to act and pointed out this was not how she raised her son. This prompted a discussion with [the CSW] about which topics and behaviors were appropriate. [T.T.] did follow instructions to express what he was whispering to [the CSW] so [Catherine] could overhear. [T.T.] stated he did not want to turn the chair around and that he was uncomfortable.

8

[Catherine] stated that [T.T.]'s behavior is influenced by [the CSW] and others. She stated to [T.T.], 'You will be coming home to me and that is a fact.' The decision was made to end the visit at this time, after 30 minutes, because [T.T.] continued to express he wanted to leave. [The CSW] spoke to [T.T.] once again about [Catherine's] current order for reunification services and her learning appropriate parenting behaviors to eliminate the child's concerns about the abuse he has disclosed. T.T. stated that this made no difference to how he felt. [The CSW] informed [Catherine] that the visit was concluded for the day."

### D. *Jurisdiction/Disposition Hearing*

The court held a contested jurisdiction/disposition hearing on February 19, 2014. The witnesses testified as follows:

#### 1. Catherine

Catherine testified that she did not give birth to T.T., but that he is her son because he was given to her at birth and she has loved and raised him. She denied telling the social worker she was T.T.'s biological mother, denied claiming to be a United States Ambassador, denied admonishing T.T. not to speak with the police, and denied providing Ericka with spiritual guidance. Catherine said her ex-husband never used the names Pablo T. or Pt.T., and she denied knowing that his children had been removed from his custody. She said that when Ericka gave T.T. to her in 2003, Ericka was aware that Catherine had been convicted of felony child stealing and had been accused of abusing her step-children.

Catherine testified that if a child misbehaves, "there's a lot of talking first and then we actually agree on consequences." She said she has never disciplined a child by withholding food or requiring a child to dress in unusual clothing. She agreed that T.T. did squats and push-ups as a form of discipline. She said she disciplined T.T. with a belt only once, after she caught him stealing from her mother. She did it "[t]o show him how most people treat their children." She never struck T.T. with her hand, never forced him to wear a ripped shirt in public, and never subjected him to excessive exercise.

9

Catherine said she did not get a birth certificate for T.T. because she was not able to get Ericka to cooperate. However, she said she was "actively in the process of trying to get an attorney or something" to help her get identification for T.T. so he "can do formal school or he can have a passport and travel and . . . participate in society . . . like everyone else. I just did not know how to do it. So I actually was actively in the process of research and the arrest happened." Catherine said she had done some internet research and asked some people, but had not yet made "an actual call to an attorney."

Catherine said she home-schooled T.T. because she did not believe he was ready for formal schooling. Instead, she worked with him on "self-esteem building, self-worth building and [so he would] be able to look at people, adults and children and peer groups and . . . appear with self-confidence."

### 2. Liza Mutis

Dependency Investigator Liza Mutis testified that in reviewing DCFS records, she learned that Catherine and Pablo had prior DCFS referrals involving Pablo's children. The referrals included allegations of general neglect, physical abuse, emotional abuse, and severe neglect. The juvenile court took jurisdiction on one occasion involving allegations of Catherine using degrading discipline practices.

Mutis interviewed T.T. on two occasions. He disclosed that Catherine would hit him with a belt and spank him when she was angry. He also said she disciplined him by making him do push-ups and wear a torn shirt in public. He said he did not have any emotions about his visit with Catherine but did not want to continue seeing her.

Mutis said DCFS was concerned about Catherine's relationship with T.T. because "it was established . . . on fraud. She concealed him for years and did not enroll him in school and . . . T.T. had absolutely no interaction with children his age on a regular basis through school. He was not receiving any medical or dental care. He has no identity and does not exist outside of what we know of him now. I feel that in the future all of this will be harmful to him. He won't be able to go to school and apply for a driver's license and do the things that children as they grow into adulthood would be able to do."

10

### 3. Dr. Juterbock

Dr. Juterbock testified that T.T. said he felt scared and nervous during visits with Catherine. Dr. Juterbock was working with him on techniques to help him calm himself during these visits.[3]

### 4. T.F.

T.F., also known as V.F, is one of Pablo's children. She testified that Catherine is not her biological mother, but is her mother "from the love that she gives me." T.F.began living with Catherine in 2009 when she was 19 years old. Catherine never abused T.F, her siblings, or T.T. in any way. Catherine never denied T.T. food, shelter, or clothing. T.T. participated in extracurricular activities such as dance lessons, voice lessons, and skate boarding. T.F saw Catherine discipline T.T. by requiring him to do calisthenics, such as 15 jumping jacks or five push-ups. Catherine had similarly disciplined T.F when she was a child. T.F said T.T.'s relationship with Catherine was very loving. T.F said she never accused Catherine of physically abusing her or her siblings.

### E. Ruling

Following argument, the court found by a preponderance of the evidence that paragraphs a-1, b-1, b-3, b-5, b-6, and g-1 were true as alleged, and paragraphs b-2, b-4 and g-2 were true as amended. The court further found by clear and convincing evidence that there would be substantial danger to T.T. if he were returned home, and there were no reasonable means by which T.T.'s physical and emotional health could be protected without removing him from Catherine's custody. Finally, the court (1) ordered a psychological evaluation of Catherine and a bonding study of Catherine and T.T., (2) granted Catherine one hour per week of DCFS-monitored visitation with T.T., and (3) ordered Catherine to participate in both individual counseling and conjoint counseling with T.T. as recommended by T.T.'s therapist.

---

[3] The first day of Dr. Juterbock's testimony was not included in the reporter's transcript.

The court explained its ruling as follows: "[W]e look at the Welfare and Institutions Code and we look at the conduct of the mother and causation and whether there's a substantial risk of harm. Certainly there's emotional harm [and] abuse. . . . [T.T.] says and starts to divulge that he was physically abused and even the mother on the stand [said] I used the belt one time two years ago to show him how people treat their children. Is that really how people out there treat their children by physically abusing them? That statement alone has many concerns for the court. So she decides not to use a belt and then after that uses excessive exercise of the child. I think this child in his current state is now beginning to realize what is normal and what [it is] to go to school and what [it is] to go and get dental treatment. What [it is] to know who I am and to know who my mother is and these are essential components for a healthy child.

"As to [Catherine's] testimony, I find it not to be credible [and] the adult sibling I found not to be credible. What I found to be credible was Dr. [Juterbock's] interest in this child to establish some sort of foundation for him to get through that which he has been told to him at some point in his life and not to find out about it through a traffic stop and that is not his biological mother. So clearly the conduct of this child and the conduct of the mother places the child at substantial risk of not only of physical harm but of emotional harm."

Catherine timely appealed.

## DISCUSSION

### I.

### The Juvenile Court's Jurisdictional Findings Are
### Supported by Substantial Evidence

Catherine contends the juvenile court erred in sustaining jurisdictional counts against her. We review the juvenile court's jurisdictional findings and order for substantial evidence. (*Los Angeles County Dept. of Children & Family Services v. Superior Court* (2013) 215 Cal.App.4th 962, 966; *In re R.C.* (2012) 210 Cal.App.4th 930, 940.) Under this standard, "[w]e review the record to determine whether there is any substantial evidence to support the juvenile court's conclusions, and we resolve all

12

conflicts and make all reasonable inferences from the evidence to uphold the court's orders, if possible." (*In re David M.* (2005) 134 Cal.App.4th 822, 828; accord, *In re Drake M.* (2012) 211 Cal.App.4th 754, 763; *In re Savannah M.* (2005) 131 Cal.App.4th 1387, 1393.)

Notably, Catherine does not suggest that the juvenile court erred in sustaining jurisdictional counts against Pablo or Ericka. To the contrary, Catherine expressly "*does not contest* T.T.'s dependency (due to the unappealed actions of Ericka and Pablo)." (Italics added.) Accordingly, her contentions regarding the jurisdictional counts against her are without legal significance: "As a result of [the dependency law's] focus on the child, it is necessary only for the court to find that one parent's conduct has created circumstances triggering section 300 for the court to assert jurisdiction over the child. (*In re P.A.* (2007) 155 Cal.App.4th 1197, 1212; *In re Alexis H*. (2005) 132 Cal.App.4th 11, 16.) Once the child is found to be endangered in the manner described by one of the subdivisions of section 300—e.g., a risk of serious physical harm (subds. (a) & (b)), serious emotional damage (subd. (c)), sexual or other abuse (subds. (d) & (e)), or abandonment (subd. (g)), among others—the child comes within the court's jurisdiction, even if the child was not in the physical custody of one or both parents at the time the jurisdictional events occurred. (*In re Claudia S*. [(2005)] 131 Cal.App.4th [236,] 246.) For jurisdictional purposes, it is irrelevant which parent created those circumstances. A jurisdictional finding involving the conduct of a particular parent is not necessary for the court to enter orders binding on that parent, once dependency jurisdiction has been established. (*In re Alexis H*., at p. 16.) As a result, it is commonly said that a jurisdictional finding involving one parent is ' "good against both. More accurately, the minor is a dependent if the actions of either parent bring [him] within one of the statutory definitions of a dependent." ' (*In re X.S.* (2010) 190 Cal.App.4th 1154, 1161.) For this reason, an appellate court may decline to address the evidentiary support for any remaining jurisdictional findings once a single finding has been found to be supported by the evidence. (E.g., *In re Alexis E.* (2009) 171 Cal.App.4th 438, 451 [addressing remaining findings only '[f]or [f]ather's benefit']; *In re Joshua G*. [(2005)]

129 Cal.App.4th [189,] 202 [when a jurisdictional allegation involving one parent is found supported, it is 'irrelevant' whether remaining allegations are supported]; *In re Shelley J.* (1998) 68 Cal.App.4th 322, 330 [declining to address remaining allegations after one allegation found supported]; *Randi R. v. Superior Court* (1998) 64 Cal.App.4th 67, 72 [same].)" (*In re I.A.* (2011) 201 Cal.App.4th 1484, 1491-1492.)

In any event, substantial evidence supported the trial court's jurisdictional findings as to Catherine. Section 300, subdivision (a) provides that a child is within the jurisdiction of the juvenile court if, among other things, "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm inflicted nonaccidentally upon the child by the child's parent or guardian." Catherine urges that the evidence did not support a finding under this section because she hit him with a belt only once and did not leave any marks or bruises. We do not agree. Although Catherine testified that she hit T.T. with a belt only once, T.T.'s statements to the social worker suggested much more regular abuse. T.T. said Catherine "hit me and stuff. She uses a belt *usually*." (Italics added.) Although T.T. was not specific about the frequency with which he was disciplined with a belt, his statement that Catherine "*usually*" hit him with a belt supports the conclusion that the abuse happened with some regularity. It was within the trial court's discretion to credit T.T.'s statements and reject Catherine's. (See, e.g., *In re Jessica C.* (2001) 93 Cal.App.4th 1027, 1043 [trier of fact is free to disbelieve a witness if there is a rational ground for doing so].)

The inference of regular physical abuse also is supported by T.T.'s repeated statements that he hoped not to have to see Catherine again because she hit him. It is highly unlikely that a child would request no contact with a parent because of a single spanking years earlier. Thus, T.T.'s request not to have to see Catherine supports the juvenile court's conclusion that T.T. was subjected to regular physical abuse and was at risk of future serious physical abuse.[4]

---

[4]     Having so concluded, we do not address Catherine's remaining contentions regarding the court's exercise of jurisdiction over T.T.

Catherine urges that, even if she did strike T.T. with a belt, "striking a child on the buttocks with a belt, where no marks are left and the child is not seriously hurt, does not create a risk of serious physical harm to the child." The case on which Catherine relies for this assertion, *In re Joel H.* (1993) 19 Cal.App.4th 1185, 1201-1202 (*Joel H.*), does not support it. There, the court said only that spanking the child "with a hand on his bottom" did not constitute serious physical abuse; the court noted, moreover, that there was no evidence that the child's de facto parents "struck Joel *with objects*" or "spanked Joel '*with a big belt.*' " (Italics added.) *Joel H.*, therefore, does not support the proposition that hitting a young child with a belt does not constitute serious physical abuse.

## II.

### The Juvenile Court's Dispositional Orders Is Supported
### by Substantial Evidence

Catherine contends the juvenile court's dispositional order removing T.T. from her care was not supported by substantial evidence because she "did not pose a clear and convincing threat to T.T.'s physical health, safety, protection, or physical or emotional well-being." For the reasons that follow, we disagree.

Section 361, subdivision (c)(1) provides that a dependent child "shall not be taken from the physical custody of his or her parents or guardian . . . with whom the child resides at the time the petition was initiated, unless the juvenile court finds clear and convincing evidence [that] . . . [t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's or guardian's physical custody." The fact that a minor has been adjudicated a dependent child "shall constitute prima facie evidence that the minor cannot be safely left in the physical custody of the parent or guardian with whom the minor resided at the time of injury." (§ 361, subd. (c)(1).)

15

In the present case, there was abundant evidence of likely substantial danger to T.T.'s physical and emotional well-being if he were returned home. As we have said, there was evidence that Catherine physically abused T.T. by hitting him with a belt. Further, Catherine's testimony that "most people" treat their children this way suggests that she believes such abusive discipline is acceptable and, indeed, widely practiced. Under these circumstances, the juvenile court did not err in concluding that T.T. would be in physical jeopardy if returned to Catherine.

There was also abundant evidence that T.T.'s emotional well-being would be at risk if he were returned home. When T.T. was first detained, he was ambivalent about returning to Catherine, telling the CSW that he felt "good" about living with his foster mother and was "okay" with not visiting Catherine. Subsequently, he said he did not wish to see Catherine and, when told visitation was mandatory, asked that the visit be limited to five minutes, sat with his back to Catherine, and refused to speak with her or answer her questions. Indeed, T.T.'s discomfort at being in Catherine's presence was so extreme that his therapist opined that it was not in T.T.'s best interests to participate in conjoint therapy with Catherine.

Given T.T.'s extreme discomfort at being in the same room with Catherine for even a few minutes, the juvenile court did not err in concluding that T.T.'s emotional well-being would be endangered if he were to be returned to Catherine's physical custody.

## DISPOSITION

The juvenile court's jurisdictional and dispositional orders are affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


EDMON, P. J.

We concur:



KITCHING, J.



EGERTON, J.[*]

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.