Filed 3/19/21  In re O.G. CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re O.G., a Person Coming Under the Juvenile Court Law. | B307109 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>N.G.,<br><br>        Defendant and Appellant;<br><br>O.G.,<br><br>        Appellant. | (Los Angeles County Super. Ct. No. 20CCJP02106) |

APPEALS from orders of the Superior Court of Los Angeles County, Philip L. Soto, Judge.  Affirmed.

Christine E. Johnson, under appointment by the Court of Appeal, for Defendant and Appellant.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, and Veronica Randazzo, Deputy County Counsel, for Plaintiff and Respondent.

Aida Aslanian, under appointment by the Court of Appeal, for Minor.

—————————————————————

The juvenile court sustained a dependency petition against J.R. (Father) and appellant N.G. (Mother).  (Welf. & Inst. Code, § 300, subd. (b)(1).)[1]  At disposition, the court removed appellant O.G., Mother's newborn son, from parental care and custody.  We conclude that substantial evidence supports the orders.

The record shows Mother is a habitual drug abuser who used methamphetamine "all day, every day" since 2017, tested positive for it at prenatal exams and refused entreaties to begin a drug abuse treatment program while pregnant.  Chronic drug use is prima facie evidence of her inability to provide regular care to a newborn.  Though Mother entered a drug treatment program after giving birth, when faced with the possibility of losing O.G., her drug abuse during pregnancy showed indifference to O.G.'s safety and justified his removal from her care and custody until she demonstrates a commitment to sobriety.  We affirm.

_____

[1] Father did not appeal the court's orders.  Undesignated statutory references are to the Welfare and Institutions Code.

**FACTS AND PROCEDURAL HISTORY**

O.G. was born in April 2020.[2]  One month earlier, Mother tested positive for methamphetamine.  O.G.'s gestational exposure to illicit drugs was reported to respondent Department of Children and Family Services (DCFS).

Mother told a social worker (CSW) "she did not attend all her prenatal care visits due to her using methamphetamines throughout her pregnancy."  Mother's blood tests during prenatal exams were positive for methamphetamine in November 2019, January and March.  Despite his drug exposure, O.G. had no major medical conditions at birth.

Mother told DCFS "there is substance abuse in her home [and] she would drink alcohol while being high on 'meth.' "  She was willing to enter a residential treatment program because she does not want to lose O.G.  She has a history of depression and cutting herself but takes no prescribed medications for her mental health.  In 2018, Mother was hospitalized in a mental health facility for drinking excessively.

Father knew of Mother's drug use and positive drug tests during pregnancy.  He has used methamphetamine since 2016, became addicted, and now uses it daily.  He and Mother smoked the drug together during her pregnancy; he realizes this was "very bad."  Father has another child (not with Mother) but does not know where the child is or have identifying information.  Father is on probation.  He agreed to drug test and enter a treatment program.

CSW interviewed the paternal grandmother (PGM).  PGM knew Mother and Father used "crystal meth" and marijuana

_____

[2] Unlabeled dates in this opinion refer to the year 2020.

while living in her garage. She warned them to stop. PGM opined that they have "a strong substance abuse addiction" and observed behavioral changes when they used drugs. She stopped living with them when she realized they would not stop using drugs. PGM is willing to care for O.G. while the parents receive treatment. O.G. was placed with PGM.

DCFS filed a dependency petition. As amended, it alleges that both parents have a history of substance abuse; Mother currently abuses methamphetamine, marijuana and alcohol, which she used while pregnant. O.G. requires constant care and supervision, which Mother and Father are incapable of providing due to their substance abuse. Mother has mental and emotional problems resulting in hospitalization, which endangers O.G. and places him at serious risk of harm. (§ 300, subd. (b).) DCFS assessed O.G. as being at high risk due to chronic parental substance abuse.

Mother and Father entered residential drug treatment programs soon after O.G.'s birth. Father tested positive for methamphetamine upon entering and negative afterward. Mother's program is licensed to take newborns.

At the detention hearing, the court found Father to be O.G.'s presumed parent. The parents denied the petition. The court found a prima facie case to detain O.G. because leaving him in parental custody poses a substantial danger to his wellbeing. It rejected the family's request to release O.G. to Mother at her treatment facility. It found that Mother's motivation to protect O.G. is not strong "since she was using while she was pregnant."

In its jurisdiction report, DCFS reported that Mother has been enrolled in a residential treatment program for nearly three

4

months.  Mother's counselor stated that she was complying with the program and testing negative for drugs.

Mother expressed shame for using drugs while pregnant but said it was difficult to stop because she had been a heavy user for two years.  She tried methamphetamine when she was 14 and used marijuana and alcohol while in middle school.  Since 2017, she has used methamphetamine "all day, every day."  She was in a car accident while intoxicated and one month pregnant.  Mother was 23 when O.G. was born.

Mother owned up to her past but insisted that she and Father entered rehabilitation to change their lives and be responsible for O.G.  Father said he and Mother started using drugs together in 2016.  Once, Mother put herself in a treatment program, showing Father proof of attendance; she also tried to stop using drugs on her own.  She relapsed because friends brought drugs to the home and everyone would use them.  Father urged Mother to stop using drugs but felt hypocritical because he was using; he also urged her to stop using alcohol.  Father has used methamphetamine for 11 years, since he was 13 years old.  He was not sober for a single day from 2016 until he began the drug treatment program in 2020.  He is on probation because he stole cars to get money for drugs.

Mother was initially unaware she was pregnant.  She and Father were "getting high off meth" and Mother was throwing up.  Mother admitted using the drug during this time and tested positive for it when she went for her first ultrasound.  A substance abuse counselor encouraged Mother to enroll in an inpatient program during the pregnancy, but she refused.

PGM reported that Mother "was three months pregnant and she was still in the street using drugs and drinking alcohol."

PGM told Mother "not to do things that will harm her and the baby but she did not listen." Father and Mother used "meth" together. PGM is "scared that [when Mother] comes out, she will relapse." PGM believes that Mother and Father will continue to use alcohol and marijuana after their programs because after "[t]en years of using every day, it is going to be really hard to rehabilitate in two months." The parents seemed motivated by O.G.'s detention.

The parents agreed that PGM is taking good care of O.G., who gained six pounds and was strong and healthy. He is being evaluated because of his prenatal drug exposure. Father completed a 60-day residential treatment program in June; he then failed to appear for a drug test in July.

Mother was hospitalized in 2018. She described herself as depressed, drunk and said she wanted to hurt someone or herself. Father had no concerns about Mother's mental health.

The petition was adjudicated on July 29. It was stipulated that if Mother were called, she would testify that (1) she has been in an inpatient program since April 4; (2) she has been clean and sober since March 4; (3) she has completed courses in parenting and anger management; (4) she receives individual counseling; (5) she will transition to a sober living program in October; (6) her current facility has a bed available for O.G.; and (7) she will follow court orders and work with DCFS to ensure O.G.'s safety.

A July 28 letter from Mother's treatment facility stated that she resided there, was making efforts in her treatment goals and showed improved attitude and behavior. It recommended that O.G. live at the facility with Mother because it could help motivate her recovery.

6

Mother asked the court to dismiss the petition.  Although she admittedly used drugs during her pregnancy, O.G. was not born with drugs in his system and she promptly enrolled in a treatment program.  Mother felt there is no current risk to O.G.  The court found that Mother's 2018 mental health problems posed no current risk; however, "what is adversely affecting the child is the drug abuse and addiction by both of the parents."

The court sustained allegations that Mother and Father have a history of substance abuse and currently abuse alcohol, marijuana, and methamphetamine; Mother abused drugs and alcohol while pregnant.  The parents' drug use prevents them from providing regular care and supervision of O.G.  The court dismissed the count relating to Mother's mental health.  The court declared O.G. a dependent of the court.

At disposition, counsel for O.G. and the parents asked the court to place O.G. with Mother in her residential treatment program.  DCFS asked the court to keep O.G. in his placement with PGM.  The court found, "I do not have enough here to say that this child will be safe with the mother for a long-term situation in that facility."  It applauded Mother's participation in a treatment program; however, her chronic drug abuse casts doubt on her ability to recover in a few months.

The court stated that Mother may reunify with O.G. if she continues to move in the right direction.  It instructed DCFS to start overnight visits.  Mother may breastfeed if she tests negative for drugs.  The court wanted to know more about Mother's plans upon leaving the residential facility to be sure she "will succeed when I give the child to [her]."  In short, "I need to know the child will be safe and the mom will be clean and sober for good.  I don't want relapses.  I don't want to have the child

removed again," which would harm O.G.'s best interests.  The court gave DCFS discretion to release O.G. to his parents, if appropriate.  The parents were ordered to participate in counseling; a drug and alcohol program with aftercare; and random or on demand drug testing.

## DISCUSSION

### 1.  Standard of Review

Appellants have the burden of demonstrating that no substantial evidence supports the court's jurisdictional and dispositional orders.  (*In re D.B.* (2018) 26 Cal.App.5th 320, 328–329.)  Without reweighing the evidence or evaluating witness credibility, we resolve all conflicts in favor of the respondent and draw all reasonable inferences in support of the judgment.  (*Ibid.*; *In re R.T.* (2017) 3 Cal.5th 622, 633.)

### 2.  Dependency Jurisdiction Over O.G.

The court has jurisdiction over O.G., regardless of the merits of Mother's appeal.  A child " 'is a dependent if the actions of either parent bring [him] within one of the statutory definitions of a dependent.' " (*In re X.S.* (2010) 190 Cal.App.4th 1154, 1161.)  "Because the juvenile court assumes jurisdiction of the child, not the parents, jurisdiction may exist based on the conduct of one parent only." (*In re J.C.* (2014) 233 Cal.App.4th 1, 3.)  The court sustained the petition based on the conduct of both parents.  Father did not appeal; thus, the court has jurisdiction over O.G. and we may decline to address the evidence supporting the findings against Mother.  (*Id.* at pp. 3–4.)

Mother argues that her claim is justiciable, even if the court has dependency jurisdiction based on the sustained petition against Father.  She asserts that the findings against her formed the basis for removing O.G. from her care and could prejudicially impact future dependency proceedings.  (*In re Drake M.* (2012)

8

211 Cal.App.4th 754, 762–763.)  We exercise our discretion and review the findings against Mother.  (*Ibid*.)

The court's task is to determine if a child is at substantial risk of serious physical harm without court intervention.[3]  Past parental conduct " ' "may be probative of current conditions" if there is reason to believe that the conduct will continue' " and the child needs protection.  (*In re Christopher R.* (2014) 225 Cal.App.4th 1210, 1216.)  "The court need not wait for disaster to strike before asserting jurisdiction.  [Citation.]  This is why the statute uses the word 'risk.' "  (*In re K.B.* (2021) 59 Cal.App. 5th 593, 603.)

Parental drug addiction poses such an inherent risk to an infant requiring constant supervision and care that a " 'finding of substance abuse is prima facie evidence of the inability of a parent or guardian to provide regular care resulting in a substantial risk of harm.' "  (*In re Christopher R., supra,* 225 Cal.App.4th at p. 1219.)  Mother and Father are habitual users of methamphetamine, " 'an inherently dangerous drug known to cause visual and auditory hallucinations, sleep deprivation, intense anger, volatile mood swings, agitation, paranoia, impulsivity, and depression.' "  (*In re Alexzander C.* (2017) 18 Cal.App. 5th 438, 449, disapproved on other grounds in

---

[3] There must be proof "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child, . . . or by the inability of the parent or guardian to provide regular care for the child due to the parent's or guardian's . . . substance abuse." (§ 300, subd. (b)(1).)

*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7.) Father engaged in crime to support their drug habit.

Though Mother was ashamed of using methamphetamine during pregnancy, she was unable to stop because she had been using it "all day, every day" since 2017. At her first ultrasound, she tested positive and a substance abuse counselor urged her to enroll in an inpatient drug program. Despite knowing the risk to O.G., she did not enroll in a program and continued to use methamphetamine. She admitted to a CSW that she used it throughout her pregnancy, which was borne out by multiple positive drug tests. Mother skipped some prenatal exams because she was using methamphetamine.

Mother has abused alcohol and marijuana since middle school, and first tried methamphetamine at age 14. According to Father, Mother put herself in a substance abuse treatment program; however, she relapsed and continued to use drugs and alcohol afterward. Her addiction is so strong that she was willing to expose O.G. to the toxic effect of methamphetamine.

Given Mother's history and inability to protect O.G. during gestation, the court could reasonably believe she will continue to use drugs without court intervention. Only the realization that O.G. was detained motivated Mother to start treatment. The record supports the exercise of dependency jurisdiction. There is a substantial risk of serious harm to O.G. Mother's chronic drug abuse prevents her from providing regular care for an infant.

### 3. Disposition Order

Once the court determined that O.G. falls within section 300 and declared him a dependent, it had to decide if he would be safe in parental care. (*Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 248.) Removal requires proof of a substantial

danger to the physical health, safety, protection, or physical or emotional well-being of the child, and that even with the provision of services there is no reasonable means to protect him without removal from his parents. (§ 361, subd. (c)(1).)

The court made the required findings. It stated, "Under [section] 361(c), I find that there is by clear and convincing evidence grounds that, if the child were returned to the parents at this time, it would be injurious to the child's welfare, physical and emotional. And there is no reasonable means to keep the child safe without continued removal."

Mother and O.G. contend that the court improperly shifted the burden of proof onto Mother to show why O.G. could not live with her at her residential treatment facility. The record does not support their contention. The CSW spoke to staff at the treatment centers where both parents were living. DCFS advised the court that Mother's "facility is licensed and allowed to take children from birth up to the age of 2 years old."

At the hearing, DCFS argued that O.G. is "safely placed" with PGM; Mother has "a long history of ongoing substance abuse" and cannot be trusted with O.G.'s care; and she "has a lot of work to do" to establish that "she can maintain her sobriety on a long-term and ongoing basis." Whatever treatment center staff might say, it is "simply representations of hope that they have for the mother where you have an established track record of very bad judgment to this child's detriment."

The court agreed with DCFS. It found Mother "is moving in the right direction, but she has a long way to go. She has a chronic history by her own admission in the detention reports, at least three years. You don't get over it in three months." The court told DCFS to start overnight visits at a slow pace at the

11

treatment center, mindful of the risk Mother "falls off the wagon" when the program ends. The court concluded, "I need to know the child will be safe and the mom will be clean and sober for good. I don't want relapses. I don't want to have the child removed again. That is not good for the mental, physical, or emotional development of the child."

Substantial evidence supports the decision to remove O.G. from Mother. Mother has a history of failed attempts at sobriety. She self-enrolled in a rehabilitation program, then relapsed when the program ended. By her own admission, " 'When I found out I was pregnant I stopped [using methamphetamine on] my own. . . . I stayed sober about 3 months.' . . . When asked when she began using after the three months sober Mother reported, 'I started using again when I moved in with [Father]. I started using again because it was around.' " Mother also admitted to a drunk driving accident while pregnant.

The court could reasonably find that Mother needs very little encouragement to lapse into substance abuse. She refused offers of an inpatient program after testing positive during pregnancy, despite knowing the dangers posed to O.G. She used drugs during pregnancy just because methamphetamine "was around." PGM believes Mother and Father are strongly addicted and will resume substance abuse when their programs end.

The "provision of a home environment free from the negative effects of substance abuse is a necessary condition for the safety, protection and physical and emotional well-being of the child." (§ 300.2.) The goal is to avert the *risk* of harm to the child. (*Ibid.*; *In re I.J.* (2013) 56 Cal.4th 766, 773.) The court felt it could not ensure O.G.'s safety without assurances that Mother's brief sobriety will last.

Mother's daily drug use, her failure to benefit from a prior drug treatment program and her eagerness to use methamphetamine merely because it is accessible all point to the propriety of removal. "Indeed, her use of [methamphetamine] during the last months of her pregnancy confirmed her poor judgment and willingness to endanger [O.G.'s] safety due to substance abuse. Thus, the decision to remove [O.G.] from her care and custody was supported by substantial evidence." (*In re Christopher R., supra,* 225 Cal.App.4th at p. 1219.)

Appellants argue that the court failed to make factual findings regarding reasonable alternatives to removal. (§ 361, subd. (e).) The court knew O.G. could be placed at Mother's treatment facility; it expressly rejected this alternative because it did not believe Mother had overcome a decade of substance abuse in three months. The court nonetheless authorized overnight visits for O.G. at the facility and gave DCFS discretion to allow O.G. to live with Mother. The court considered the options and made a reasonable choice.

**DISPOSITION**

The orders are affirmed.

**NOT TO BE PUBLISHED.**

LUI, P. J.

We concur:

ASHMANN-GERST, J.

HOFFSTADT, J.

14