Filed 2/14/22  In re S.P. CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).   This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re S.P., A Person Coming Under the Juvenile Court Law. | B312293 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>M.P.,<br><br>Defendant and Appellant. | Los Angeles County Super. Ct. No. 21CCJP00732A |

APPEAL from an order of the Superior Court of Los Angeles County, Lisa A. Brackelmanns, Judge Pro Tempore of the Juvenile Court.  Reversed and vacated.

Elizabeth C. Alexander, under appointment by the Court of Appeal, for Defendant and Appellant.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, Sally Son, Deputy County Counsel, for Plaintiff and Respondent.

Father challenges juvenile court findings declaring him an offending parent and a disposition order purporting to remove his then-eight-year-old daughter S.P. from his physical custody. He maintains the evidence was insufficient to find he failed to protect S.P. from the risk of harm posed by mother's substance abuse and mental health condition because it was undisputed that his daughter had been and remained safely placed in her maternal grandparents' home.[1] We agree with father and reverse the adjudication findings to the extent they declare him an offending parent and vacate the disposition order as to father.

## FACTS AND PROCEDURAL HISTORY

Consistent with our standard of review, we state the facts in the light most favorable to the juvenile court's findings, resolving all evidentiary conflicts in favor of the findings, and indulging all reasonable inferences to uphold the court's order. (*In re I.J.* (2013) 56 Cal.4th 766, 773; *In re Isabella F.* (2014) 226 Cal.App.4th 128, 137–138 (*Isabella F.*).)

S.P. was born in July 2012. She has lived with her maternal grandparents for most of her life. Mother and father (who were and remain unmarried) also lived with the grandparents since S.P.'s birth until she was three or four years old.

In 2015 or 2016, father took S.P. to Montana for approximately three months. He later returned S.P. to California and moved her back into the maternal grandparents' home where she has resided ever since.

Around the same time, the parents moved out of the maternal grandparents' home to live in a motel with father's

---

[1] Mother is not a party to this appeal and she does not challenge the findings regarding her conduct.

friend P.J. P.J. and mother later began a romantic relationship. Father observed domestic violence between P.J. and mother when he lived with them, and all three used methamphetamine together. By 2016, father no longer lived with P.J. and mother, and he has not used methamphetamine or other substances since then.

The family came to the attention of the Los Angeles County Department of Children and Family Services (the Department) in February 2021, when mother gave birth to P.J.'s daughter, Baby Girl W.[2] The baby tested positive for methamphetamine and mother admitted using the drug during her entire pregnancy. Mother had been using methamphetamine since she was 21 years old. She currently lived in a tent encampment with P.J., who also used drugs.

Mother told the Department her older daughter, S.P., lived with the maternal grandparents. The maternal grandmother confirmed S.P. had lived with them since birth and they provided "all the care" for the child. They were aware of mother's drug use and would not allow mother in the home when she was under the influence. Since mother began her relationship with P.J., the maternal grandparents had only seen her three to four times a year. Mother had tried to see them for Christmas in 2020, but the grandparents would not allow her into the home due to concerns about COVID-19.

The maternal grandfather reported father treated mother well when the parents lived with the grandparents and he did not observe any issues in their relationship. He said father had seen S.P. only two times within the last five to six years. He reported

---

[2] Father has no relationship with Baby Girl W. and she is not a subject of this appeal.

the paternal grandfather tried to arrange contact between father and S.P., but father "does not follow through." The maternal grandfather believed father cared for the paternal grandmother, who was wheelchair bound, and father may be focused on her health. He said the maternal grandparents wanted to adopt S.P., so they could "legally" take part in her schooling and take her on family vacations without waiting for father to grant permission.

The paternal grandfather said he had no concerns regarding S.P.'s placement with the maternal grandparents. He reported they were protective of S.P. He described an occasion when mother had said "negative things" to S.P. and the maternal grandfather intervened and told mother to leave the home.

The Department interviewed S.P., who appeared "happy" and "very inquisitive." S.P. asked the social worker to contact her father and have him visit more. She did not know much about her mother, who she said visited only "once in a while." S.P. said she felt "safe" with her grandparents and she "loves her mom and dad." She said her grandparents took good care of her and there was nothing she wanted to change about their home.

In March 2021, the Department filed the operative petition to declare S.P. a dependent child. In addition to counts regarding mother's substance abuse, mental health condition, and domestic violence with P.J., the petition alleged the following counts regarding father's conduct:

> b-2: "The children, [S.P.] and Baby Girl [W.]'s mother, . . . has a history of illicit drug abuse including methamphetamine and is a current abuser of methamphetamine and amphetamine, which renders the mother incapable of providing regular care for the

4

child.  On prior occasions, the mother abused methamphetamines during the mother's pregnancy with the child, Baby Girl [W.] . . . The child, [S.P.]'s father, . . . failed to take action to protect the child when he knew of the mother's illicit drug use.  Such illicit drug use by the mother . . . and [S.P.'s] father's failure to protect the children endanger the children's physical health and safety and places the children at risk of serious physical harm, damage and danger."

b-5:  "In 2015, . . . mother . . . made an inappropriate plan for the [child's] care and supervision in that the mother left the child, [S.P.], in the care of the [child's] maternal grandparents without maintaining contact with the maternal grandparents or ensuring access to services and medical care.  The father, [S.P.'s father], knew of this plan and failed to take actions to maintain contact and ensure the child's needs were able to be met.  The child, [S.P.], has expressed feeling sadness and rejection as a result of the loss of contact with the parents.  Such an inappropriate plan established for the [child] by the [child's] mother endangers the [child's] physical health and safety and places the [child] at risk of serious physical harm, and damage."

b-6:  "The children, [S.P.] and Baby Girl [W.]'s mother . . . has mental and emotional

problems . . . which renders mother incapable of providing regular care for the children. . . . The father, [S.P.'s father], knew of the mental and emotional problems of the mother and failed to protect the child, [S.P.], in that [S.P.'s] father allowed the mother to have unlimited access to the child."

Father confirmed he lived with mother and P.J. five or six years earlier. He observed them engage in domestic violence and he used methamphetamine with them a handful of times. He also noted mother had visual hallucinations, which he believed were due to her substance abuse. In 2016, he distanced himself from mother and P.J. because of their "negative influence," and since that time he has focused on caring for his mother, S.P.'s paternal grandmother.

Father said he was unable to care for S.P. because he resided in a community for elderly people, with his mother, as a registered caregiver. He said he had no safety concerns regarding S.P.'s placement with the maternal grandparents, but he complained that they did not "give him updates about any family gatherings for [S.P.]," including her birthday.

Father said he had concerns about S.P.'s behavior after the girl visited with mother, and he had considered getting a restraining order to stop mother from seeing S.P. at the maternal grandparents' home. However, he had learned the maternal grandfather recently decided that mother would not be allowed in the home.

Father disagreed with the maternal grandparents adopting S.P., but he had considered giving them temporary custody. He would not agree to a permanent legal guardianship, but

6

was open to sharing custody. He declined to give the maternal grandparents his phone number because they "incessantly" contacted the paternal grandfather about S.P.'s behavior.

The maternal grandparents expressed concern that there was no documentation confirming their custody of S.P. While they were still able to obtain educational and medical services for S.P., there was "one occasion" when the medical provider "appeared to be bothered" by the lack of documented consent from the parents. They had denied mother's most recent request to return to their home because of the open dependency case.

In its report to the juvenile court in advance of the adjudication hearing, the Department determined there were "no immediate child safety concerns regarding [father]," but it assessed that father "lack[ed] insight [about how] his lack of contact and consistency has led [S.P.] to feel rejected." The Department also reported father was aware of the domestic violence between mother and P.J., but he took no action to address S.P.'s resulting "tantrums and behavioral issues."

On March 29, 2021, the juvenile court held a combined jurisdiction and disposition hearing for S.P. and Baby Girl W. With respect to S.P., counsel for mother and father joined in arguing the counts related to the eight-year-old should be dismissed because S.P. was not exposed to mother's substance abuse and placing S.P. with the maternal grandparents was an appropriate plan. Father's counsel alternatively argued father should be struck from the counts because the evidence showed mother's substance abuse and mental health condition only began to present a risk after she became involved with P.J., and even then father ensured S.P. was protected by placing the child with her maternal grandparents.

7

S.P.'s counsel recommended the court strike father from the allegations regarding mother's substance abuse and mental health condition; dismiss the count alleging the parents made an inappropriate plan for S.P.; declare father a "non-offending" parent; and otherwise sustain the petition with respect to mother's conduct. Because S.P. had not lived with mother for many years and mother was rarely around the child, S.P.'s counsel maintained there was "not a lot for [father] to have protected against" and he "definitely" did not "fail[ ] to protect" S.P.

Regarding the decision to place S.P. with the maternal grandparents, the minor's counsel argued this was an "appropriate" plan that addressed mother's apparent inability to care for the child. The court questioned whether placing S.P. with her grandparents was enough, noting the parents did not grant the grandparents "legal rights over the child as far as being able to access services, special education rights, medical waivers." S.P.'s counsel responded that access to services was not the "crux" of the petition, which "really has to do with mother's mental health and her drug use." Because the risk of harm related to those issues was addressed, and S.P. had been "very well taken care of in her grandparents' home," the minor's counsel maintained the parents had made an appropriate plan. Moreover, because there was sufficient evidence to declare jurisdiction based on mother's drug use and other conduct, S.P.'s counsel argued the court could enter an order granting the grandparents educational rights, without finding the parents made an inappropriate plan for the child.

The Department argued father failed to protect S.P. because he knew about mother's condition and did nothing

to "address any of the issues or . . . to take care of the child." Regarding the placement with the maternal grandparents, the Department acknowledged S.P. "has been safe," but questioned whether it was "an intentional appropriate plan."

The juvenile court dismissed the count alleging the parents made an inappropriate plan for S.P. and otherwise sustained the petition. With respect to father, the court explained: "The child was born [in February 2021] suffering from withdrawals and tested positive for amphetamine. . . . Mother has a history of methamphetamine use, and . . . I also think [S.P.'s father] was aware of what was going on between the mother and [P.J.], and he did not take any action to protect this very young child, so I am going to leave [S.P.'s father] in as a failure to protect." Later, the court similarly observed, "I think [S.P.'s father], although he hasn't been living with the mother, I think he was aware of her mental health issues and her substance abuse issues and the domestic violence that was going on and did not take any action, so the court [is] going to leave him in as [a] failure to protect." The court, however, agreed with S.P.'s counsel that the parents had made an appropriate plan to keep the child safe, observing the allegations in that count did not address the "crux of this case."

With respect to disposition, the court found, "[f]or the reasons . . . stated earlier," S.P. could not be protected without removing her from father's custody. The court granted father monitored visitation and ordered him to participate in parenting classes and individual counseling. The court also entered an

9

order designating the maternal grandparents as educational rights holders for S.P.[3]

Father filed a timely appeal from the offending parent findings and disposition order.

## DISCUSSION

Father contends the evidence was insufficient to support the findings declaring him an offending parent because there was no evidence that S.P. was ever at risk of serious physical harm or abuse as required under Welfare and Institutions Code[4] section 300, subdivision (b). He emphasizes the Department's reports and argument at the adjudication hearing admitted S.P. was safe and well provided for in the maternal grandparents' care. Even if, as the juvenile court found, he "did not take any action" in response to mother's obvious substance abuse and mental health concerns, he argues this was insufficient to support the findings against him without evidence that his inaction actually placed S.P. at risk. We agree the evidence was insufficient to support the findings.[5]

---

[3]     The parents retained their status as educational rights holders under the order.

[4]     Statutory references are to the Welfare and Institutions Code.

[5]     The Department urges us to refrain from reaching the merits of father's contentions because striking him from the findings will not affect the juvenile court's jurisdiction over S.P. We decline that invitation. Mootness is not a jurisdictional defect, and we have discretion to review a parent's challenge to an adjudication finding, even when dependency jurisdiction is not at stake, particularly where the findings could have ramifications for the parent beyond jurisdiction. (*People ex rel. Becerra v.*

"In dependency proceedings, the social services agency has the burden to prove by a preponderance of the evidence that the minor who is the subject of the dependency petition comes under the juvenile court's jurisdiction. [Citations.] We review the jurisdictional findings for substantial evidence. [Citation.] We consider the entire record, drawing all reasonable inferences in support of the juvenile court's findings and affirming the order even if other evidence supports a different finding. [Citation.] We do not consider the credibility of witnesses or reweigh the evidence. [Citation.] Substantial evidence does not mean 'any evidence,' however, and we ultimately consider whether a reasonable trier of fact would make the challenged ruling in light of the entire record. [Citation.] The parent has the burden on appeal of showing there is insufficient evidence to support

_Superior Court_ (2018) 29 Cal.App.5th 486, 496; _In re Drake M._ (2012) 211 Cal.App.4th 754, 762–763 (_Drake M._).) We also note our Supreme Court has granted review to decide whether an appeal of a jurisdictional finding is in fact moot when the parent asserts that he or she has been or will be stigmatized by the finding. (_In re D.P._ (Feb. 10, 2021, B301135) [nonpub. opn.], review granted May 26, 2021, S267429.)

Father asserts the offending parent finding will brand him with a child welfare services history that may influence future proceedings. Because we agree with minor's counsel that there was nothing more for father to do to protect his daughter, we conclude removing the potential stigma of an offending parent finding is sufficient reason to reach the merits of his appeal. (See _Drake M., supra,_ 211 Cal.App.4th at p. 763 [where outcome of appeal was "the difference between father's being an 'offending' parent versus a 'non-offending' parent," reviewing court exercised discretion to address appeal's merits, even though dependency jurisdiction over the child would remain in place under the unchallenged findings regarding mother's conduct].)

11

the juvenile court's order." (*Isabella F., supra,* 226 Cal.App.4th at pp. 137–138.)

Section 300, subdivision (b)(1) authorizes dependency jurisdiction where "[t]he child has suffered, or there is a substantial risk that the child will suffer, *serious physical harm or illness*, as a result of the failure or inability of the child's parent or guardian to adequately supervise or protect the child . . . or by the inability of the parent or guardian to provide regular care for the child due to the parent's or guardian's mental illness, developmental disability, or substance abuse." (Italics added.) Because the statute permits jurisdiction "*only so long as is necessary* to protect the child from risk of suffering serious physical harm or illness" (*ibid.*, italics added), the evidence must show the child faces a *current* risk of serious physical harm. (See *In re J.N.* (2010) 181 Cal.App.4th 1010, 1023 (*J.N.*).)

Thus, section 300, subdivision (b) requires a showing of "*concrete* harm or risk of physical harm to the child." (*In re Rocco M.* (1991) 1 Cal.App.4th 814, 820–821 (*Rocco M.*), italics added.) "As appellate courts have repeatedly stressed, ' "[s]ubdivision (b) means what it says. Before courts and agencies can exert jurisdiction under section 300, subdivision (b), there must be evidence indicating that the child is exposed to a *substantial* risk of *serious physical* harm or illness." ' " (*In re Jesus M.* (2015) 235 Cal.App.4th 104, 111.) "The purpose of a dependency proceeding is to protect the child, rather than prosecute or punish the parent." (*In re Emily L.* (2021) 73 Cal.App.5th 1, 15.)

S.P.'s counsel asked the juvenile court to strike father from the counts regarding mother's drug abuse and mental

health condition and to declare father a "non-offending" parent, citing undisputed evidence that S.P. had not lived with mother for many years and that mother was rarely around the child. Thus, the minor's counsel argued there was "not a lot for [father] to have protected against" and he "definitely" did not "fail[ ] to protect" S.P. The juvenile court rejected that recommendation, citing the harm done to Baby Girl W. (who was born suffering from methamphetamine withdrawal, but who is *not* father's daughter), father's knowledge of mother's history of substance abuse, and father's lack of action "to protect this very young child."[6] Critically, the juvenile court did not identify any harm or risk of harm *to S.P.* Indeed, with respect to the allegation that the parents failed to make an appropriate plan for S.P., the juvenile court dismissed the count, accepting the minor's counsel's argument that placing S.P. with her maternal grandparents was an "appropriate" plan to address mother's demonstrated inability to care for the child. The Department's counsel similarly acknowledged S.P. "has been safe" in the maternal grandparents' care. For his part, father confirmed he had no desire to take physical custody of S.P. and S.P. would

---

[6] We presume the juvenile court was not confused about Baby Girl W.'s parentage, but we also acknowledge the way the Department articulated the substance abuse count could have led the court to base its ruling on father's failure to protect the newborn. The only harm alleged in count b-1 is the harm to Baby Girl W.; however, the allegation against father refers to his purported "failure to protect the *children*" from mother's substance abuse. (Italics added.) In a literal sense, father did fail to protect Baby Girl W., but as a legal matter, his offending parent status could be based upon only his failure to protect his eight-year-old daughter S.P.

13

remain in the maternal grandparents' home, as he lived with his mother in a community restricted to elderly people and their registered caregivers. Because it was undisputed that S.P. had been and remained safe from harm in the maternal grandparents' care, there was no evidence to support the findings against father under section 300, subdivision (b). (See *J.N., supra,* 181 Cal.App.4th at p. 1026.)

The Department argues father's "longstanding knowledge of Mother's substance abuse and failure to support the maternal grandparents in protecting the child from Mother's substance abuse issues amply supports the juvenile court's findings." It points to evidence that father had considered obtaining a restraining order to protect S.P. from mother; that he did not give the maternal grandparents his phone number or visit S.P. when the grandparents arranged for him to do so; and that he refused to allow the grandparents to adopt S.P. or to grant them legal guardianship. None of this evidence was sufficient to declare him an offending parent under section 300, subdivision (b) because none of this purportedly neglectful conduct placed S.P. at risk of "concrete harm." (*Rocco M., supra,* 1 Cal.App.4th at pp. 820–821.)

*In re Andrew S.* (2016) 2 Cal.App.5th 536 (*Andrew S.*) is instructive. There, the presumed father of two young children challenged the juvenile court's jurisdiction finding under section 300, subdivision (b) that "he failed to provide the children with the necessities of life, placing them at substantial risk of serious physical harm or illness" during the father's incarceration in a Texas prison. (*Andrew S.*, at p. 539.) The evidence showed the children's mother had " 'adequate income and housing' and 'extended family support' " and "there was no evidence that

14

[the children] at any time lacked adequate food, clothing, shelter or medical treatment or that [the mother]—or the children's maternal grandmother in [the mother's] absence—had otherwise failed to meet their needs." (*Id.* at pp. 542–543.) The juvenile court nevertheless concluded the father had "failed to protect the children" under section 300, subdivision (b) because he failed to make "arrangements for the children with maternal relatives" in anticipation of the mother, who was charged with abusing the children, losing custody. (*Andrew S.*, at pp. 541, 543–544.) The reviewing court disagreed and reversed. (*Id.* at p. 548.)

The *Andrew S.* court explained that, while section 300, subdivision (b) establishes a basis for jurisdiction where the willful or negligent failure to provide for a child creates substantial risk of physical harm or illness, it does not authorize "the juvenile court's assumption of jurisdiction over an otherwise well-cared-for child simply because an absent parent has not provided support." (*Andrew S., supra,* 2 Cal.App.5th at p. 542.) Because the undisputed evidence showed the children's needs were met during the father's incarceration, the *Andrew S.* court concluded "the Department did not satisfy its burden of proof" under the jurisdictional statute. (*Id.* at pp. 542–544.)

The same conclusion is compelled here. Regardless of father's alleged neglect, it is undisputed that the maternal grandparents met S.P.'s needs and that S.P. was never at risk of suffering serious physical harm from mother's misconduct while in the grandparents' care. (See *Andrew S., supra,* 2 Cal.App.5th at pp. 542–543.) Contrary to the Department's assertion, no formal plan for support was required, and no legal guardianship was mandated, so long as S.P. continued

15

to receive adequate care and support from the grandparents.[7] (See *id.* at pp. 542–544; see also *In re X.S.* (2010) 190 Cal.App.4th 1154, 1160 [reversing section 300, subdivision (b) jurisdiction finding that father had failed to provide for child where child was well cared for by the maternal grandmother and father's failure to provide did not cause the child to suffer harm or create risk of future harm].)

As for the contention that father should have followed through with his idea to obtain a restraining order, the undisputed evidence shows the maternal grandparents regularly and effectively denied mother access to S.P. without a court order. They consistently did so when mother was under the influence of drugs; when mother made disparaging comments to her daughter; when mother's Christmas visit would have posed a potential risk of COVID-19 exposure; and, most recently, when mother attempted to see S.P. while this dependency case was pending. Regardless of whether father's concerns justified his tentative thoughts about seeking a restraining order, the evidence plainly demonstrated a restraining order was not necessary to protect S.P. from mother.

There was no evidence that father failed to protect S.P., who had been and remained safely placed with her maternal grandparents at the time of the adjudication hearing. The juvenile court erred in finding father was an offending parent

---

[7]     Moreover, it is absurd to suggest that in order to demonstrate his capacity to maintain his parental rights, father was required to surrender those rights by consenting to the grandparents' adoption of his daughter.

16

under section 300, subdivision (b). And, because the juvenile court relied on that finding in rendering its disposition order against father, that order also must be vacated in its entirety as to father.[8] (See *In re Janet T.* (2001) 93 Cal.App.4th 377, 392.)

---

[8] Among other errors, the juvenile court also erred in purporting to remove S.P. from father's physical custody under section 361, as the undisputed evidence showed S.P. did not reside with father when the Department filed the dependency petition. (See § 361, subd. (c) [authorizing removal "from the physical custody of [the child's] parents . . . with whom the child resides at the time the petition was initiated" upon finding by clear and convincing evidence of enumerated conditions].) That error was inconsequential, however, because father made clear that he did not wish to assume physical custody of his daughter. (See § 361.2, subd. (a) [requiring juvenile court to "determine whether there is a parent of the child, with whom the child was not residing at the time that the events or conditions arose that brought the child within the provisions of Section 300, who desires to assume custody of the child"].)

## DISPOSITION

The adjudication findings regarding father's conduct are reversed. The disposition order is vacated as to father.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EGERTON, J.

We concur:

LAVIN, Acting P. J.

VIRAMONTES, J.*

---

*     Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.